847 F.2d 445
 27 ERC 1931, 56 USLW 2668, 18 Envtl.
L. Rep. 21,092
 Roy R. ROMER, Governor of the State of Colorado; City of
Boulder, Colorado; Board of County Commissioners of the
County of Boulder, Colorado; City of Fort Collins,
Colorado; Board of County Commissioners of the County of
Larimer in the State of Colorado; City of Loveland,
Colorado; and The City and County of Denver, Colorado, Appellants,
v.
Frank C. CARLUCCI, in his capacity as Secretary of Defense;
United States Department of Defense; Edward C. Aldridge, in
his capacity as Secretary of the Air Force; United States
Department of the Air Force; and Ronald Reagan, President
of the United States, Appellees.
WESTERN SOLIDARITY, Tri-State MX Coalition, Inc., Nebraskans
Opposed to the MX, Nebraska Nuclear Weapons Freeze Campaign,
Nebraskans for Peace, Denver Nuclear Weapons Freeze
Campaign, Poudre Valley Nuclear Weapons Freeze Campaign,
Boulder Womens International League for Peace and Justice,
MX Information Center, Black Hills Alliance, Rocky Mountain
Farmers Union, Wyoming Outdoor Council, National Campaign to
Stop the MX, Mobilization for Survival, American Indians
Against Desecration, Wyoming State Representative Lynn
Dickey, Bishop Bob Gordon Jones, Reverend LaRoy Seaver,
Reverend Norman Austin, Reverend Howard Osborn, Reverend
Richard Hill, Reverend Joseph Moroney, Reverend Ed Dolinar,
Reverend Michael Carr, Reverend Ben Perry, Reverend Joseph
Damhorst (S.J.), Reverend Robert Davidson, Vernal Cross,
Leonard Crow Dog, Matthew King, Mark Koons, Mary Ann Buscaj,
Norma DeSelms, Kenneth DeSelms, Gene Zimmerman, Helen
O'Grady, Andrea Convoy, Mae Kirkbride, Linda Kirkbride,
Roger Byrd, Friends of the Earth, Inc., Committee for a Sane
Nuclear Policy, Council for a Livable World and
Environmental Action, Inc., Appellants, (Intervenor Plaintiffs Below)
v.
Ronald REAGAN, President of the United States of America;
Frank C. Carlucci, Secretary of Defense; Edward C.
Aldridge, Secretary of the Air Force, United States
Department of Defense, Appellees*.
 Nos. 86-1458, 86-1517.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 15, 1987.
Decided May 18, 1988.
 
 Neal T. Kilminster, Washington, D.C., for appellants.
 Peter R. Steenland, Jr., Dept. of Justice, Washington, D.C., for appellees.
 Before LAY, HEANEY, BRIGHT, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN and MAGILL, Circuit Judges.
 HEANEY, Circuit Judge.
 
 I. OVERVIEW
 
 1
 In this case, the Court sitting en banc reconsiders the challenges of the state of Colorado and various environmental organizations to the adequacy of an environmental impact statement submitted by the Department of the Air Force. The statement was filed in conjunction with the proposed deployment of MX missiles in former Minuteman III missile silos in Colorado and Nebraska. We reverse the district court's finding that the claims were barred by the political question doctrine. We hold that section 110 of the Department of Defense Authorization Act, 1984, Pub.L. No. 98-94, Sec. 110, 97 Stat. 614, 621-22 (1983) (DAA 1984), requiring the Air Force to file an environmental impact statement (EIS) applies to all of the MX missiles authorized for deployment by Congress. Because this provision defines the scope of the required EIS in terms of the "proposed deployment and peacetime operation of the MX missiles in the Minuteman silos," we further hold Colorado's claims relating to the environmental impact of the MX missile project, as well as the claims of the environmental groups concerning the environmental impact of peacetime operations, can be heard in federal court. In this light, we order the district court to review these claims with all the rigor and scrutiny required by law. However, the claims of the environmental groups urging that the EIS include a discussion of alternative weapons systems, alternative basing modes, and the potential wartime use of the missiles fall outside of the terms of the statute. We thus find the federal courts without power to consider these matters.II. FACTUAL BACKGROUND
 
 A. Statutory History of MX Missile Program
 
 2
 The nuclear defense of the United States is based upon a "strategic triad." The first leg of this triad consists of submarine launched ballistic missiles, the second centers on an airborne nuclear strike force, and the third on land-based intercontinental ballistic missiles. The MX missile project is part of an effort to modernize the third leg of the triad by developing and deploying a more advanced, accurate, and powerful land-based nuclear missile system.
 
 
 3
 By the late 1970's, it appears that Congress and the Executive had agreed in principle to modernize the land-based component of the triad by the deployment of the MX missile. The exact mode in which these weapons would be deployed, however, was hotly contested throughout the late 1970's and early 1980's. After a series of disagreements between the two branches, Congress enacted the "Jackson Amendment" to the Department of Defense Authorization Act, 1983, Pub.L. No. 97-377, 96 Stat. 1830, 1833, 1846-49 (1982), which required the President to submit a detailed technical report discussing alternative basing and weapons systems and conditioned funding of the missile project on explicit congressional approval of the President's proposals.
 
 
 4
 Following the directives set forth by the Jackson Amendment, the President created the Scowcroft Commission to examine possible alternative basing modes. After extensive study, the Commission recommended that 100 MX missiles replace aging Minuteman III missiles in existing silos.
 
 
 5
 In response, Congress enacted section 110 of DAA 1984. This section provided for the procurement of not more than 21 MX missiles to be deployed in the manner recommended by the President's report. Additionally, the law required the Secretary of the Air Force to prepare an environmental impact statement "in accordance with all terms, conditions, and requirements of the National Environmental Policy Act of 1969 [42 U.S.C. Secs. 4321-4370 (1983) (NEPA) ] on the proposed deployment and peacetime operations of MX missiles in the Minuteman silos * * * " (emphasis added).[1]
 
 
 6
 Subsequently, in 1985 Congress provided for the purchase of 21 additional missiles. In doing so, it did not specifically provide any additional directives concerning compliance with NEPA or concerning where and how these missiles would be based. See Department of Defense Authorization Act, 1985, Pub.L. No. 98-525, Sec. 110, 98 Stat. 2492, 2504, 2506 (1984) (DAA 1985).
 
 
 7
 In 1986, Congress provided funds for 12 more missiles. Again, the legislation did not make explicit reference to compliance with NEPA or to the basing mode of the new missiles. It did, however, declare that not more than 50 of the MX missiles could be placed in Minuteman silos. In addition, it stated that, unless another basing mode was specifically approved by Congress, deployment of additional missiles was prohibited and further procurement was limited to those necessary to support testing programs for the MX. See Department of Defense Authorization Act, 1986, Pub.L. 99-145, Sec. 141, 99 Stat. 583, 603-604 (1985) (DAA 1986). In 1987, the Congress authorized funds for 12 additional missiles for testing, bringing the total to 66. See Department of Defense Authorization Act 1987, Pub.L. No. 99-661, Sec. 103, 100 Stat. 3816, 3826 (1986) (DAA 1987).
 
 
 8
 On October 7, 1983, the Secretary of Defense issued a draft EIS for all 100 missiles proposed by the President for eventual deployment. After a 45-day public comment period during which public hearings were held in Wyoming and Nebraska, the EIS was issued on January 30, 1984. The first ten missiles were deployed prior to a December 31, 1986, deadline. See Letter from Peter R. Steenland, Chief Appellate Section, Land & Resources Division, Department of Justice to Robert St. Vrain, Clerk, United States Court of Appeals for the Eighth Circuit, March 9, 1988, Attachment "A".
 
 B. The Proceedings Below
 
 9
 In separately filed complaints consolidated in the district court below, the Governor of Colorado and various counties and municipalities in the State of Colorado (collectively "Colorado"), together with Western Solidarity Inc., Friends of the Earth, Inc., Committee for a Sane Nuclear Policy, Council for a Liveable World, and Environmental Action, Inc. (collectively "environmental groups") brought suit against the Secretary of Defense, the Secretary of the Air Force, and the President of the United States (collectively "the Air Force") challenging the adequacy of the MX missile project's EIS.
 
 
 10
 Colorado first claims that the EIS filed by the Air Force failed to come to terms with the environmental impact of the project upon the state of Colorado. In this regard, it claims it was improperly excluded from "meaningful involvement" in the EIS hearings conducted by the Air Force. Second, it asserts that the EIS did not adequately consider the effect of the MX project on Colorado's water supply. Third, it alleges that the Air Force did not adequately consider several potentially detrimental consequences of the project on the health and safety of Colorado citizens. Fourth, it maintains that the Air Force did not adequately discuss the impact of placing MX missiles on an active geological fault zone. Fifth, Colorado claims that the Air Force did not properly explore the potential impact of the project on employment, housing, land use, and public services within the state. Sixth, it maintains that the EIS failed to discuss the impact of the project on the state's endangered species. Finally, Colorado asserts that the implications of transportation, storage, and construction of missile components within the state were never examined. Nor, it claims, were the environmental consequences of defensive measures likely to accompany the project, such as the "superhardening" of former Minuteman silos and/or the introduction of a protective anti-ballistic missile system, ever taken into account.
 
 
 11
 The environmental groups also allege that the Air Force EIS failed to meet the requirements of NEPA. First, these groups maintain that the EIS failed to discuss adequately the environmental impact of the MX missiles in case of accidents, including here the impact of accidental launch and natural disasters, such as earthquakes. Second, they assert the EIS did not discuss the environmental impact of the (intentional or wartime) use of the missiles. Third, they claim the EIS failed to discuss the full range of alternatives required by NEPA, including alternative defense systems to the MX and alternative basing modes for the missile.
 
 
 12
 It is important to note that neither Colorado nor the environmental groups challenge the substantive strategic decisions concerning the deployment of the missiles, but rather simply wish to secure an EIS which meets the requirements prescribed by Congress.
 
 
 13
 Both Colorado and the environmental groups request declaratory relief as well as mandatory and prohibitory injunctions. Specifically, both groups seek a declaration that the EIS failed to comply with NEPA and that the Air Force's action in proceeding with the project in light of the EIS's deficiencies violated NEPA and the Administrative Procedure Act, 5 U.S.C. Secs. 701-706 (1982). Further, both groups request an order requiring the Air Force to prepare a satisfactory EIS. In addition, Colorado requests the Court to order the Air Force to implement appropriate measures to mitigate impacts in the state. Finally, both appellants request a prohibitory injunction enjoining the continuation of activity on the MX missile project until the Air Force complies with the requirements of NEPA.[2]
 
 
 14
 In Western Solidarity, Inc. v. Reagan, CV84-L-280, slip op. (D.Neb. Feb. 20, 1986), the district court dismissed the consolidated suits on the pleadings. It found that all the claims were barred under the political question doctrine. The court declared that it lacked "judicially discoverable and manageable standards" for resolving the issue. Id. at 6. Second, it found that the relief requested would "directly impinge on the foreign policy and military preparedness of the country," and thus involved decisions textually committed by Articles I and II of the Constitution to coordinate branches of government. Id.; see also Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).
 
 
 15
 On appeal, in Lamm v. Weinberger, No. 86-1458, slip op. (8th Cir. May 21, 1987), a panel of this Court reversed the district court. It found the question of whether the Air Force EIS met the requirements of NEPA justiciable under the political question doctrine. Next, the panel declared that the MX missile project was, even in the absence of section 110 of DAA 1984, independently subject to NEPA. Id. at 11 n. 9. In this regard, the panel found that the language of section 110 limited rather than created review for compliance under NEPA. Third, it found that section 110 did not represent a comprehensive or "programmatic" blue-print for deployment of the MX missiles authorized by Congress under the 1984, 1985 and 1986 Defense Authorization Acts, but only applied to the first 21 MX missiles authorized by the Congress in DAA 1984. These fundamental assumptions led the panel to a complex multi-tiered holding in which each MX missile authorization by Congress was viewed in isolation for purposes of reviewing compliance of the Air Force EIS with NEPA.
 
 
 16
 The panel held all of Colorado's claims under NEPA were justiciable. In terms of the claims of the environmental groups, however, the holding was a good deal more complex. First, the panel found that the environmental groups' claims involving accidents such as earthquakes and accidental launches were fully justiciable. Next, the panel found claims involving assessment of the impact of intentional use of the MX non-justiciable as to the 21 missiles authorized by section 110 of DAA 1984. However, the panel found these claims to be fully reviewable as to the 79 remaining missiles authorized by the 1985 and 1986 Acts or proposed by the President. Third, the panel found the claims involving the need to discuss alternative basing modes non-justiciable in terms of the first 21 missiles authorized to be placed in Minuteman III silos by the 1984 Act, but reviewable as to the remaining 79 missiles. Finally, in terms of the requirement of discussing alternative weapons systems, the panel found these claims were not reviewable as to the first 54 missiles authorized by the 1984, 1985, and 1986 Acts, but justiciable as to the rest of the missiles proposed by the President.
 
 
 17
 The panel held that declaratory and mandatory remedies were proper concerning all of the missiles either authorized or proposed. The panel then found that prohibitory relief was barred in terms of the first 21 missiles authorized by the 1984 Act because of language in section 110 declaring that the Air Force "shall proceed promptly following the publication of the final environmental impact statement ... with the deployment of MX missiles in the missile silos." The panel, however, stated that prohibitory relief was available for the rest of the 79 missiles that had been authorized or proposed.
 
 
 18
 In response, the Air Force filed a petition for rehearing and rehearing en banc. This Court granted the request for rehearing en banc on July 24, 1987. See Lamm v. Weinberger, 825 F.2d 176 (8th Cir.1987) (en banc).[3]
 
 III. DISCUSSION
 
 19
 A. Section 110 of the Department of Defense Authorization Act, 1984 Defines the Environmental Impact Statement Requirements for All Missiles Authorized for Deployment by Congress.
 
 
 20
 1. Overview.
 
 
 21
 Section 110 of DAA 1984 limits the EIS requirements for MX missiles to their proposed deployment and peacetime operations in former Minuteman silos. All parties concede that these requirements apply to the first 21 missiles authorized by the 1984 Act. Essential to resolution of this case, however, is the determination of whether these requirements represent a comprehensive or "programmatic" decision concerning the missiles authorized by Congress for deployment in the 1984, 1985, and 1986 Defense Authorization Acts.
 
 
 22
 The Air Force forcefully contends that section 110 of DAA 1984 represents a programmatic decision for the entire MX program and thus defines the requirements for an EIS in terms of all missiles authorized by Congress. In response, the environmental groups assert that the MX project is, even apart from the language of section 110 of DAA 1984, independently subject to NEPA. Moreover, they contend that there was no one single comprehensive deployment decision concerning the placement of the MX in the former Minuteman missile silos. Rather, they maintain the procurement, and thus the basing mode, decisions were sequential and independent ones in which Congress intended to reevaluate the entire project with each appropriation. Most importantly, they maintain that in this sequential policy, Congress left open to complete reevaluation the question of what level of environmental compliance would be required for the project.
 
 
 23
 Based upon careful examination of the statutory language and legislative history of the 1983, 1984, 1985, 1986, and 1987 Defense Authorization Acts, we find that section 110 of DAA 1984 represents a programmatic decision concerning all the missiles authorized for deployment.
 
 
 24
 2. Discussion.
 
 
 25
 In the early 1980's, the question of how the MX missile was to be based was the subject of exhaustive and contentious debate within Congress and particularly between Congress and the Executive Branch. Early on, because of the size and importance of the MX project, Congress injected itself into the basing mode decision by conditioning the expenditure of funds first on receipt of a presidential report concerning the basing decision and later on specific congressional approval of executive basing mode proposals.
 
 
 26
 In section 103(c) of the Department of Defense Authorization Act, 1983, Pub.L. No. 97-252, Sec. 103(c), 96 Stat. 718, 720 (1982) (DAA 1983), Congress authorized $158,000,000 as an initial appropriation for the basing and deployment of the MX but declared that such money could not be obligated (i.e. released to the Executive Branch) "until the President completes his review of alternative MX missile system basing modes and notifies the Congress, in writing, of the basing mode in which the MX missile system will be deployed * * *."
 
 
 27
 On November 22, 1982, President Reagan responded by proposing a system of deployment termed "closely spaced basing" or "dense pack" in which the weapons would be placed in a closely grouped array of "superhardened" silos under the control of the F.E. Warren Air Force Base. Congress acrimoniously rejected this proposal. Moreover, in response, it injected itself even more deeply into the decision-making process concerning the selection of a basing mode for the MX missile.
 
 
 28
 The "Jackson Amendment" to DAA 1983 required the President to submit an extremely detailed technical report discussing alternative basing modes and alternative weapons systems and forbade expenditures appropriated under the Act until "fenced" expenditures were released by concurrent resolutions of both Houses of Congress, signalling specific approval of the President's proposal.[4]
 
 
 29
 The reporting requirement, at the heart of the Jackson Amendment, required the President to examine alternative potential basing modes and alternative weapons systems exhaustively. First, it required the President to submit a report to the Committees on Appropriations and Armed Services of the Senate and the House of Representatives which included a detailed assessment of: (1) the closely spaced basing system; (2) other MX basing systems that might serve as alternatives to the closely spaced basing system; and (3) different types of intercontinental ballistic missiles that might serve as alternatives to the MX.[5]
 
 
 30
 Second, the Jackson Amendment required a "comparative detailed technical assessment" of the following alternative weapons configurations:
 
 
 31
 (1) acceleration of the Trident II program to provide target coverage equivalent to that of the MX missile system;
 
 
 32
 (2) enhancements and improvements to the Minuteman missile force;
 
 
 33
 (3) development and deployment of a land-based missile system in deep underground basing;
 
 
 34
 (4) development of a system based on multiple protective shelters and closely spaced basing incorporating mobility and deception;
 
 
 35
 (5) a road mobile missile smaller than the MX; and
 
 
 36
 (6) a common missile for land and sea deployment.[6]
 
 
 37
 Third, the Amendment required the President to include in his report detailed assessments of:
 
 
 38
 (1) the military capability of each alternative system or missile;
 
 
 39
 (2) the survivability of each alternative system or missile;
 
 
 40
 (3) the survivability of each such system or missile against current and projected Soviet threats;
 
 
 41
 (4) the impact each such system or missile might have on present and future arms control negotiations;
 
 
 42
 (5) the geographic, geological, and other qualifications a site for each such system or missile would likely require;
 
 
 43
 (6) the environmental impact each such system or missile would likely have;[7] and
 
 
 44
 (7) the identification of possible sites for each such system or missile.[8]
 
 
 45
 In order to produce a report that complied with the requirements of the Jackson Amendment, the President created the Scowcroft Commission. See Exec. Order No. 12, 400, 3 C.F.R. 147 (1983). This Commission, led by retired General Brent Scowcroft, consisted of presidential appointees having expertise in "national security, strategic forces and the foreign relations of the United States." Id.
 
 
 46
 On April 6, 1983, the Commission issued its report. Based on the extensive review of alternative weapons systems and basing modes required by the Jackson Amendment, the Commission recommended that MX missiles replace aging Minuteman III missiles in existing silos for the short term. It recommended the Minuteman ultimately be replaced by a small single warhead missile that had not yet been designed.
 
 
 47
 In a letter to the chairmen of the House and Senate Appropriation Committees, the President announced that he strongly supported the recommendations of the Scowcroft Commission. Accompanying his letter was a classified report which recommended "the immediate production of the [MX] missile and deployment of 100 such missiles in existing Minuteman silos in the Francis E. Warren [Air Force Base] area." Specifically, the President directed that these missiles replace the Minuteman missiles in the 319th and 400th Strategic Missile Squadrons.
 
 
 48
 Shortly thereafter, on September 24, 1983, Congress enacted section 110 of DAA 1984. This provision authorized procurement of 21 MX missiles to be placed in "existing Minuteman missile silos that are part of the 319th and 400th Strategic Missile Squadrons and supported by the Francis E. Warren Air Force Base, Wyoming." Clearly, Congress, by adopting the same weapons system, basing mode, and even the precise basing location, had accepted, at least at the outset, the recommendation of the President and the Scowcroft Commission in its entirety.
 
 
 49
 DAA 1984 also required the Air Force to prepare an environmental impact statement, in full compliance with the requirements of NEPA, limited, however, to "proposed deployment and peacetime operation of the MX missiles in the Minuteman silos." Specifically, section 110(b)(1) (emphasis added) provided:
 
 
 50
 The Secretary of the Air Force shall prepare a full draft and final environmental impact statement in accordance with all terms, conditions, and requirements of the National Environmental Policy Act of 1969 (42 U.S.C. sec. 4321 et. seq.) on the proposed deployment and peacetime operations of MX missiles in the Minuteman silos * * *.
 
 
 51
 The dissent argues that the prepositional phrase "on 'proposed deployment ... in ... silos' " is not intended to limit the scope of the required EIS. See dissent at 467. Moreover, it continues, even if the phrase is ambiguous and could be construed as a limitation, NEPA requires that ambiguous language be construed in favor of providing EIS coverage. See 42 U.S.C. Sec. 4332(1).
 
 
 52
 We believe, however, that the phrase, when read in its entirety, (i.e. "on the proposed deployment and peacetime operations of the MX missiles in the Minuteman silos") is clearly intended to limit the scope of the EIS. First, if the phrase is not a limitation, we do not understand how it is to be construed.[9] Moreover, we note particular difficulty with the dissent's omission of the words "peacetime operations" in its paraphrase. We believe these words clearly indicate that the phrase was intended as a limitation, particularly when it is realized that the more controversial subject of environmental review of intentional use of the missiles must have existed at the margins of the debate concerning the EIS from the outset. Thus, although a selective use of ellipses might be employed to interpret parts of the phrase otherwise, common sense construction requires the remainder of the words in the disputed clause (i.e. "proposed deployment" and "in the Minuteman silos"), all controlled by the same introductory preposition ("on"), also to be recognized as words of limitation in terms of the scope of the EIS.[10]
 
 
 53
 Next, section 1231(c) of DAA 1984 required the Secretary of Defense to submit a report to the Armed Services Committees of both Houses of Congress each year from 1984 through 1988 on the progress being made in terms of both the "development and deployment of the MX missile" and of improvements being made in "silo hardening technology."[11] Congress did not condition the procurement of additional missiles on completion of these tasks, but merely on the delivery of a progress report.
 
 
 54
 At the outset, it might be argued that this information concerning silo hardening technology indicated congressional indecision about the Minuteman silo basing mode. Given the context of the exhaustive reporting requirements of the Jackson Amendment and the explicit congressional withholding of funds accompanying that measure, however, it seems very likely that the informal, unrestrictive requirements of section 1231 had only an information gathering intent.
 
 
 55
 On the other hand, this language indicates that Congress, from the very first MX appropriations measure, considered the authorization of 21 missiles as a part of a larger project involving continuing executive requests and congressional authorizations. Moreover, the requirement of executive updates concerning improvements in silo technology suggests the continued use of former Minuteman silos for the additional missiles requested in the future.
 
 
 56
 On October 19, 1984, the Congress enacted DAA 1985. Section 110 of this Act authorized funds for "not more than 21 additional operational MX missiles." Although the law clearly spoke of "additional" missiles, implying a continuing scheme of deployment, it did not mention the basing mode for the new missiles or compliance with NEPA in any respect.
 
 
 57
 It is important to note that section 110(b) of DAA 1985 provided that no funds appropriated for the 21 additional missiles it authorized could be obligated for the procurement of additional operational MX missiles unless: (a) the President submitted a special report discussing aspects of the ongoing MX program; and (b) this report was specifically approved by a complex system of joint resolutions of both Houses of Congress.[12] Specifically, this report was to discuss:
 
 
 58
 (1) whether "further acquisition of MX is in the national interest and consistent with arms control policy,"
 
 
 59
 (2) the findings "of the President concerning the effect of acquisition and deployment [of the MX] on the vulnerability of the United States land-based intercontinental ballistic missile force," and
 
 
 60
 (3) "the basing mode for the MX missile (and related improvements in silo-hardening technology)."[13]
 
 
 61
 This reporting requirement concerning the basing mode for MX is likely the most problematic congressional action in terms of establishing a programmatic decision. Yet, if the statute is read closely, it is clear that Congress is only asking for a discussion of among other things the present basing mode of the missile. It is not asking for discussion of alternative basing modes, nor is it suggesting in any specific way that there is or ought to be any fundamental basing mode change. Thus, again, in light of the detailed reporting request and specific congressional approval requirements of the Jackson Amendment, it is unlikely that Congress meant to open up the basing mode debate again in such an informal manner and with such vague directions to the President.[14]
 
 
 62
 Next, at this same time, section 110(f) of DAA 1985 amended section 1231 of DAA 1984 to require the President to submit, coincident with any requests for additional missiles, an "assessment" detailing, inter alia, "efforts to develop a more survivable basing mode for the MX." Again, in this case, funding was not conditioned on receipt or approval of this report.[15]
 
 
 63
 We believe both of these reporting requirements established by DAA 1985, in the context of the requirements of the Jackson Amendment, to be merely congressional requests for information. Moreover, we believe that such continued requests are evidence that Congress considered its appropriation as part of an ongoing silo based program.
 
 
 64
 The dissent, however, argues that these three reporting requirements indicate that Congress wished to reopen the basing decision with each appropriation. Based on these requests for information and its own reading of NEPA, the dissent concludes that discussion of alternative basing modes must be included in the Air Force EIS.
 
 
 65
 In response, we understand that the purpose of NEPA is to provide information concerning major projects affecting the human environment so that risks may be properly evaluated and decisions undertaken with sufficient understanding. We appreciate that the consideration of "alternatives" is vital to this process and that information concerning alternative basing modes is necessary information in terms of the deployment decision. We also agree that this sort of information is more useful if it is provided before deployment is undertaken. However, we do not agree that the foregoing demonstrates that Congress wished to subject its basing mode decision to NEPA review and accompanying litigation.
 
 
 66
 First, the language of section 110(b)(1) of DAA 1984 precludes NEPA review of alternative basing modes.
 
 
 67
 Second, Congress, prior to the enactment of DAA 1984, had before it the Scowcroft Commission Report which included a comprehensive study of alternative basing modes. Moreover, because of the congressionally mandated reporting requirements, it had continually updated material on silo technology and possible alternative basing modes which provided information far in excess of NEPA requirements. Given the foregoing, it is clear that NEPA's goal of considering alternatives would not be frustrated by precluding EIS review of alternative basing modes.
 
 
 68
 Third, Congress had powerful reasons for precluding NEPA review of alternative basing modes. As the dissent notes, Congress exempted the Scowcroft Commission Report from NEPA to prevent "the functioning of the * * * Commission from being disabled by NEPA litigation." Dissent at 467. Such concerns likely motivated the decision concerning the alternative basing mode exemption. Congress did not want its basing mode choice impeded by time-consuming litigation or second-guessed by intermeddling courts.
 
 
 69
 Further, in concurring that the proposed EIS need not discuss alternative weapons systems or intentional use of the missiles, Judge Arnold writes:
 
 
 70
 It is really expecting too much of the National Environmental Policy Act (NEPA) and the EIS process to ask them to grapple with issues of that scope and magnitude, issues that would inevitably involve large amounts of classified information, and as to which environmental effects as the term is normally used would be unlikely to be of decisional significance. * * * Defendants cannot be reasonably expected to reinvent the world or re-examine strategic doctrine from the ground up every time they compile an EIS on a weapons-related decision. It is only "appropriate" alternatives to a proposed course of action that an EIS must describe.
 
 
 71
 Id. at 464 (citation omitted).
 
 
 72
 This is a compelling argument. Yet, we fail to understand how such logic can be used to preclude review of alternative weapons systems and intentional use of the missiles but at the same time require review of alternative basing modes. Though not expert in matters of national defense policy, it would appear to us that the consideration of alternative basing modes would, much as the discussion of alternative weapons systems and intentional use of the missile, involve issues of great scope and magnitude, include "large amounts of classified information," and would in many ways require defendants compiling an EIS to "reinvent the world [and] re-examine strategic doctrine [concerning the basing mode decision] from the ground up."
 
 
 73
 The strategic considerations in the placement of nuclear missiles are obviously of enormous importance and would involve the review of intricate and sensitive defense policy information. Moreover, consideration of the merits of one basing mode over another would likely plunge the defendant, and hence the courts, into a thoroughgoing and fundamental re-examination of strategic doctrine with regard to missile basing decisions. Finally, given the comprehensive information available to Congress in the Scowcroft Commission Report and the continual updated reports provided by statute, we believe that it is far less likely that EIS information concerning alternative basing modes would be of "decisional significance" than the discussion of alternative weapons systems or intentional use of the missiles--discussions which the dissent found unnecessary.
 
 
 74
 We, therefore, disagree with the dissent's position that the reporting requirements in DAA 1984 and DAA 1985 support the argument that EIS review of alternate basing methods is required by NEPA.
 
 
 75
 On November 8, 1985, Congress enacted DAA 1986. This act appropriated funds for "not more than 12 MX missiles." Again, neither the basing mode for the deployment of these missiles nor the question of compliance with NEPA was directly mentioned. However, a close reading of this Act provides some of the strongest evidence that Congress viewed subsequent appropriations for MX missiles as increments to the programmatic goals and requirements outlined in section 110 of DAA 1984.
 
 
 76
 Specifically, DAA 1986 limited the number of MX missiles that could be placed in former Minuteman silos to 50.[16] Moreover, DAA 1986 continued by prohibiting further deployment "unless a basing mode for the MX missile other than the existing Minuteman silos is specifically authorized by subsequently enacted legislation." It also declared that further procurement of MX missiles would be limited to those missiles necessary to support specific MX testing programs. The statute suggests that 12 to 21 missiles "should" be procured for testing programs.[17]
 
 
 77
 In this third appropriation, we find Congress still speaking in terms of "silos." The mere continuing discussion of the use of "silos" and of "limitations on the use of silos" at this late date adds further strong support to the notion that all the MX appropriations thus far were made with the silo-basing mode implicit.
 
 
 78
 Moreover, from 1984 through 1986, funds had been appropriated for 54 missiles. The statute states that "[t]he number of MX missiles deployed at any time in existing Minuteman silos may not exceed 50." Further, Congress prohibited further deployment unless a new basing mode was specifically approved by legislation and limited further procurement of MX missiles to those necessary to support two MX testing programs.
 
 
 79
 The panel opinion and the environmental groups argue that this means only that 50 MX missiles could eventually go into Minuteman silos, not necessarily that 50 of the first 54 missiles were to go into silos. Though perhaps syntactically correct, we find this argument implausible. Given the historical reality of congressional unwillingness to release funds until basing decisions had been carefully approved, and the specific prohibition in DAA 1986 against deployment in any unapproved alternative basing mode, we can hardly believe that a budget conscious Congress would appropriate funds for 12 or 34 missiles to decide, only at some unspecified later date, where they would be placed. On the contrary, we believe that this language is evidence of the congressional intent that 50 of the 54 missiles for which funds had been appropriated were to be placed in former Minuteman silos. Moreover, we find the clear prohibition in DAA 1986 on the use of an alternative basing system without explicit congressional approval confirms our belief, established by the Jackson Amendment, that Congress was committed to the silo basing mode until a better system was devised by careful study and approved by specific congressional authorization.
 
 
 80
 In many ways, DAA 1986 represented a watershed. Prior to this time, Congress and the Air Force had simply and systematically implemented the recommendation of the Scowcroft Commission as embodied in section 110 of DAA 1984.[18] By placing a 50-missile limit on silo deployment, by forbidding further procurement (other than for testing), and by requiring explicit congressional approval before the missiles could be deployed in another manner, Congress called a halt to the ongoing MX program. Further, it appeared to be preparing for another fundamental basing decision, as it had in the early 1980's prior to the silo-based program. See discussion of the Jackson Amendment, supra at 13-17.
 
 
 81
 On November 14, 1986, Congress enacted DAA 1987. Section 103 of this act provided $7,570,472,000 for "missiles." An accompanying conference report specified that $1,114,731,000 of this sum was earmarked for 12 MX missiles to be acquired under the "testing" exemption to the procurement prohibition outlined in DAA 1986. See H.R.Conf.Rep. No. 99-1001, 99th Cong., 2d Sess. 379 (1986). Under the terms of the exemption, these missiles could be used to only "support the operational test program and for the MX reliability testing program" and could not be legally deployed in any manner. See DAA 1986 Sec. 141(c)(2).
 
 
 82
 Contrary to the view expressed by the dissent, none of these actions by Congress undermine the notion that section 110 represented a programmatic decision concerning all the missiles authorized for deployment. Based on the careful analysis of the Scowcroft Commission Report, Congress in section 110 of DAA 1984 embarked on a silo-based deployment program. In this same section, Congress declared certain limitations on the applicability of NEPA. For the next two years, without further statutory direction concerning basing modes or compliance with NEPA, Congress and the Air Force continued to deploy missiles under the terms and limitations of its initial decision. In 1986, it decided to call an end--at least for the time being--to this type of deployment and specifically forbade deployment in any manner until it had studied and expressly approved an Air Force proposal. Simply because Congress decided to curtail deployment in the silo basing mode, does not undermine, in any respect, the programmatic intent of section 110 of DAA in terms of the missiles authorized for deployment.
 
 
 83
 The dissent cites the fact that the Air Force has asked the Congress to approve future deployment of missiles in a Rail-Garrison basing mode and that Congress has authorized funds to "study" this method of possible deployment[19] as further evidence that section 110 did not represent a programmatic decision. Again, these are simply preliminary steps toward beginning an independent missile deployment program and do not undermine the programmatic intent of the prior project.[20]
 
 
 84
 Finally, the dissent cites recent reports in the popular press, particularly the Arkansas Gazette and the Arkansas Democrat, which state the Air Force now intends to take MX missiles out of the silos and place them on rail cars. These reports appear to indicate that the Air Force views the prior program as a failure and wishes to redeploy the missiles. While we agree with the dissent that these materials do not represent a "secure basis for adjudication," we do not believe they raise "any serious questions that ought to be answered" in terms of the programmatic intent of section 110 of DAA 1984. See dissent at 16. Assuming this unusual new evidence is reliable, we believe, again, that it merely represents the beginnings of a distinct new program. Moreover, the fact that the prior independent program may not have been successful has nothing to do with its programmatic character.
 
 
 85
 Congress intended an environmental impact statement to be filed covering "the proposed deployment and peacetime operations of the MX missiles in the Minuteman silos." Through the Jackson Amendment and various reporting requirements, Congress generated detailed and continuous information so that it would make informed deployment decisions. At the same time, however, we believe Congress wished to preserve its authority over the choice of basing modes by preventing these decisions from being slowed down and second-guessed by NEPA litigation. It appears now that Congress is about to embark on a new basing mode decision. In so doing, it may specify any level of environmental review it desires.
 
 
 86
 In summary, in the Jackson Amendment, Congress required an extremely extensive study of alternative weapons systems and alternative basing modes and conditioned the obligation of authorized funds on specific congressional approval of these plans. DAA 1984, in appropriating funds for the first 21 MX missiles, not only appears to approve the President's basing proposal but referred to future authorizations and required continued updating on silo technology, strongly indicating a continuous plan to use the silo basing mode. In DAA 1985, in raising the number of authorized missiles to 42, Congress continued to study silo basing and request information on future basing modes, suggesting commitment to the present mode. Finally, in DAA 1986, in raising the number of missiles to 54, Congress continued to speak of a silo based missile program, capped the number of missiles to be placed in silos at 50, and declared that any remaining missiles must be used in support of the silo based program unless another basing mode was approved by specific congressional action--all actions clearly implying a consistent programmatic commitment to the silo basing mode. It now appears that Congress has halted the silo based program and is searching for a possible alternative system of deployment for a new and independent program. However, reviewing the foregoing, it is clear that Congress intended the silo basing decision delineated in section 110 of DAA 1984 to be a programmatic one in terms of all the missiles thus far authorized for deployment.
 
 
 87
 Given the fact that Congress saw each MX missile authorization as part of the initial basing plan outlined in section 110 of DAA 1984, it follows that the rest of that section, notably the provisions defining compliance with NEPA, should also apply in a programmatic way. This interpretation is supported by simple textual analysis. Moreover, given that Congress did conceive of the MX project as a continuous contiguous effort, it would make no sense to broaden the environmental inquiry once the project was under way, thus jeopardizing its completion and threatening to waste previously expended efforts. Clearly, common sense dictates that when an expensive, complex, long-term plan is undertaken, its viability is to be examined fully at the outset before substantive decisions and major expenditures are made.[21]
 
 
 88
 3. The Jackson Amendment limits the EIS requirement to those
 
 
 89
 MX missiles actually authorized by Congress.
 
 
 90
 At this point, it is important to note that, although the Jackson Amendment directed the President to assess the environmental impact of each system or missile under consideration, it exempted these assessments from the requirements of NEPA. See supra n. 7. Thus, even though 100 missiles were proposed by the President, only the 54 missiles authorized by Congress are subject at the present time to the requirements of NEPA.[22]
 
 
 91
 B. Review of the Air Force EIS, Within the Limitations Set Forth by Section 110 of DAA 1984, Does Not Violate the Political Question Doctrine.
 
 1. Overview
 
 92
 We turn at this point to consider whether this Court, even under the limitations set forth by section 110 of DAA 1984, has the power to review the Air Force EIS for compliance with NEPA. The Air Force contends that the type of decisions involved in reviewing the MX EIS are "interwoven with political issues going to the heart of foreign policy and national defense which have been already resolved by the President." Thus, it concludes, these types of decisions represent political questions not subject to judicial review. We disagree and find that the federal courts have the power, within the parameters set forth by DAA 1984, to fully review the MX project's EIS for compliance with NEPA.
 
 2. Discussion
 
 93
 In reading DAA 1984, it is clear to us that Congress intended the ongoing MX project to be subject to substantial environmental review. The terms of the statute plainly state that the "Secretary of the Air Force shall prepare a full draft and final environmental impact statement in accordance with all terms, conditions and requirements of [NEPA] on the proposed deployment and peacetime operations of MX missiles in the Minuteman silos." Obviously, Congress was concerned about the potentially dangerous effects of a nuclear missile project on the civilian population during peacetime. Moreover, these environmental restrictions were undoubtedly part of an agreement or settlement that Congress entered into with the Executive Branch in exchange for the substantial appropriations involved in this project. Given this, it now seems particularly disingenuous for the Air Force and the Executive Branch to maintain that this duty is unenforceable. We simply do not accept the contention that such an explicit statutory command, made as a condition to large congressional appropriations, on an issue this vital to the health and well-being of citizens of this country, creates a mere precatory admonition, unreviewable by the courts.
 
 
 94
 Moreover, precedent amply supports our view.
 
 
 95
 We find the issue of justiciability in the present case to be controlled by Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). There, the Supreme Court found that a purely legal question of statutory interpretation, even if accompanied by significant political overtones, was justiciable and, in fact, part of the duty of a federal court to adjudicate. Given that the present case involves such purely legal questions and that it threatens less significant political repercussions than were present in Japan Whaling Ass'n, we find that it is justiciable.
 
 
 96
 The facts of Japan Whaling Ass'n are as follows. Shortly after the Second World War, forty-six nations entered into an international agreement which created the International Whaling Commission (IWC). The IWC was given the power to set limits on the harvesting of various whale species. Though the member nations declared these quotas binding on themselves, the IWC had no power to impose sanctions for violations. Further, by filing an exception, a member nation could exempt itself from its obligation to abide by a given quota requirement.
 
 
 97
 After various efforts to provide some sort of enforcement mechanism for this agreement, Congress passed the "Packwood Amendment" to the Magnuson Fishery Conservation and Management Act.[23] This amendment required the Secretary of Commerce to monitor the whaling activities of foreign nationals and investigate any potential violations of the international agreement. Upon completion of this investigation, the Secretary of Commerce was to promptly make a decision whether to "certify" conduct by the foreign nationals which "diminished the effectiveness" of the international agreement. Under the Packwood Amendment, once the Secretary of Commerce certified such conduct, the Secretary of State had no choice but to reduce, by at least 50%, the offending nation's fishing allocation within the United States' zone.
 
 
 98
 In 1981, the IWC declared that in the foreseeable future no sperm whales could be harvested in certain regions. The next year it ordered a five year moratorium on commercial whaling to begin in the 1985-86 season and continue until 1990. Japan filed timely objections and was freed from compliance with the sperm whale quotas under the terms of the international agreement for the years 1982 through 1984. As the 1984-85 whaling season approached, however, it was clear that the United States could impose sanctions under the Packwood Amendment if Japan continued to exceed the quotas.
 
 
 99
 After extensive negotiations, Japan and the United States concluded an executive agreement wherein Japan agreed to certain harvest limits in excess of those set forth by the IWC and to cease commercial whaling by 1988, three years after the date specified by the IWC. In return, the United States agreed not to certify Japan under the Packwood Amendment.
 
 
 100
 Following this agreement, several environmental groups brought suit in district court against the Secretary of Commerce and various organizations representing the Japanese whaling industry seeking, inter alia, a writ of mandamus compelling the Secretary of Commerce to certify Japan because its actions in violation of the quotas established by the IWC "diminished the effectiveness" of the international agreement.
 
 
 101
 In response, the Japanese petitioners argued that under the political question doctrine, federal courts did not have the power to command an executive branch official to repudiate an international agreement, and thus the case was not justiciable.
 
 
 102
 The Supreme Court disagreed. The Court began by stating that the political question doctrine prevents courts from reviewing controversies which involve "policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Id. at 230, 106 S.Ct. at 2866, 92 L.Ed.2d at 178. This was so, the Court continued, for the reason that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." Id. at 230, 106 S.Ct. at 2866, 92 L.Ed.2d at 178. (citation omitted).
 
 
 103
 Yet, the court found that in terms of the mandamus petition, its task involved construing the Packwood amendment, a purely legal question of statutory interpretation. Moreover, even though the Court admitted that the adjudication of this case would likely have significant political overtones, it declared that the issues involved were not only fully justiciable but that their resolution was part of an unshirkable duty of federal courts under the Constitution.
 
 Specifically, it declared:
 
 104
 As Baker [v. Carr] plainly held, however, the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of IWC quotas presents a purely legal question of statutory interpretation. The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below. We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both the Congress and the Executive play in this field. But under the Constitution, one of the judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy, and turn to the merits of petitioners' arguments.
 
 
 105
 Id. at 230, 106 S.Ct. at 2866, 92 L.Ed.2d at 178-79. (emphasis added).
 
 
 106
 The holding of Japan Whaling Ass'n clearly establishes the justiciability of the present case. We find that a dispute that raises the possibility of ordering the Executive Branch to repudiate an international executive agreement requires an action far more "interwoven with political issues going the heart of foreign policy and national defense which have been already resolved by the President" than the review for environmental compliance of a weapons system. In the former case, the judicial action threatens to absolutely thwart a clear and established action by the Executive. In the later case, the court's action would not thwart the Executive Branch but would simply require it to follow congressional directives mandating that its project be completed in an environmentally safe manner. Further, as in Japan Whaling Ass'n, the issues presented to this Court are purely legal ones of statutory interpretation, the resolution of which are a part of our constitutional duty.
 
 
 107
 We further note that in the recent case of No GWEN Alliance v. Aldridge, 841 F.2d 946 (9th Cir.1988), the Ninth Circuit found a very similar claim justiciable. In No GWEN, environmental groups brought suit to compel the Air Force to file Environmental Assessments (EA's) that complied with NEPA in connection with the installation of the Ground Wave Emergency Network (GWEN), a project designed to send war messages to United States strategic forces during and after a nuclear war. In response to the Air Force contention that such a claim was barred by the political question doctrine, the court specifically stated:
 
 
 108
 We conclude that a lawsuit challenging development of a defense installation on the grounds that the responsible agency did not discuss environmental impacts causally related to the installation raises justiciable questions.
 
 
 109
 Id. at 951.
 
 
 110
 We thus hold the present controversy justiciable.
 
 IV. CONCLUSION
 
 111
 Heretofore, we have found that Congress intended that only the missiles it had actually authorized for deployment were subject to the EIS requirements of NEPA. Second, we have held that Congress intended to define the scope of the EIS requirement in terms of the "proposed deployment and peacetime operations of the MX missiles in the Minuteman silos." Finally, we have declared review of the EIS for compliance with NEPA to be justiciable under the political question doctrine. We therefore remand to the district court the claims of Colorado and the environmental groups concerning the MX missile EIS that come within the terms of section 110 of DAA 1984. We further order the district court to review these claims with all the rigor and scrutiny normally required by NEPA.
 
 
 112
 Specifically, because we find that all of Colorado's claims involve either the deployment of the missiles or their peacetime operation within the silos,[24] the entirety of its case is reviewable. Similarly, we find the claim of the environmental groups regarding accidents in terms of the deployment and normal operation of the missile to be justiciable. However, because Congress has limited the scope of the required EIS to the "proposed deployment and peacetime operation of the MX missiles in the Minuteman silos," we find the claims of the environmental groups concerning alternative weapons systems, alternative basing modes, and intentional or wartime use of the missile are precluded by the clear limitations of the statute.
 
 
 113
 In terms of remedies, we find that justiciability presumes the availability of declaratory relief. At this point, however, we find the consideration of more intrusive remedies premature and leave those determinations to the district court when and if it should find both that the MX missile EIS violates the provisions of NEPA and that declaratory relief is inadequate.
 
 
 114
 Therefore, the decision of the district court is reversed, and this case is remanded to it for action consistent with this opinion. Each party shall bear its own costs on appeal. The mandate of this Court shall issue forthwith.
 
 
 115
 ARNOLD, Circuit Judge, joined by BRIGHT, Senior Circuit Judge, and McMILLIAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 116
 I agree fully with much of the Court's opinion. Specifically, I agree that the political-question doctrine does not make this case nonjusticiable. The case is nothing more than an exercise in statutory interpretation, the kind of work that courts routinely do every day. The outcome of the case will have national-security and foreign-policy implications, but that is true of many lawsuits that are undeniably well within the judicial purview. If the plaintiffs ever establish that the defendants have violated any law, difficult questions of discretion, perhaps even of judicial power, may arise at the remedy stage, but there is no need to decide those questions now, as the Court properly explains, ante at 463-64. I also agree that Colorado's claims, relating in general to the sufficiency of the environmental impact statement as it concerns peacetime operation of MX missiles in silos, are appropriate for resolution by the District Court on remand.
 
 
 117
 But with respect to some of the claims of the intervening plaintiffs, Friends of the Earth, Inc., Committee for a Sane Nuclear Policy, Council for a Livable World, and Environmental Action, Inc., I have the misfortune to find myself in disagreement with the Court. I can understand and accept defendants' position that they ought not be required to do an EIS on "intentional" (that is, wartime) use of the missiles, or on the environmental effects of alternative defense systems--use of one or both of the other two legs of the Triad, long-range bombers and submarine-launched strategic missiles. It is really expecting too much of the National Environmental Policy Act (NEPA) and the EIS process to ask them to grapple with issues of that scope and magnitude, issues that would inevitably involve large amounts of classified information, and as to which environmental effects as the term is normally used would be unlikely to be of decisional significance. Nuclear war would probably destroy anything worthy of the name of environment. No one needs an EIS to make that clear. Defendants cannot reasonably be expected to reinvent the world or re-examine strategic doctrine from the ground up every time they compile an EIS on a weapons-related decision. It is only "appropriate" alternatives to a proposed course of action that an EIS must describe, cf. Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, 1135 (5th Cir.1974) (alternative of rail transportation did not have to be developed in the course of deciding whether to build the Tennessee-Tombigbee Waterway). So I agree with the defendants and with the Court with respect to the issues of wartime use and alternative defense systems--not because of Section 110 of the 1984 Defense Authorization Act, 97 Stat. 614, 621-22 (1983), but simply because of my reading of NEPA itself.
 
 
 118
 The question of alternative basing modes, however, seems quite different, and on that question I part company with the Court. Whether an MX missile should be in a silo or on a railroad car is a choice far less cosmic than whether to put strategic nuclear weapons on land, on a bomber, or on a submarine. With respect to the silo-vs.-railroad choice, comparative environmental effects can be manageably assessed and might, at the margin, influence someone, for example a Member of Congress, to choose one basing mode over another. I would hold, for reasons to be explained shortly, that the EIS must thoroughly explore alternative basing modes. This result is compelled by NEPA itself, and I see nothing in Section 110 of the 1984 Act that requires or permits a different conclusion.
 
 I.
 
 119
 It is appropriate to start with NEPA itself. That is the statute under which plaintiffs' cause of action arises. Section 110 of the 1984 Defense Authorization Act (which I shall sometimes refer to simply as "Section 110") comes into the case by way of defense. The defendants argue that it excludes NEPA altogether, or at least limits it, for purposes of this case. So the case falls into two convenient parts: (1) whether NEPA would apply absent Section 110; and (2) the effect of Section 110, if NEPA would otherwise apply.
 
 
 120
 The operative provision of NEPA at issue in this case is Section 102(2)(C), codified as 42 U.S.C. Sec. 4332(2)(C). It provides that "all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed" environmental impact statement. It is not contended that the placement of MX missiles is a "minor" action, or that its effect on the quality of the human environment is insignificant. Nor do defendants suggest that there is any general exception from NEPA for matters affecting national security. Defendants have never claimed that a national-security exemption exists for the MX program. In fact, they concede "that there is no 'national security' exemption from the requirements of the National Environmental Policy Act of 1969...." Brief for Appellees 13.[1]
 
 
 121
 Nor is the requirement that a detailed EIS be prepared affected by the fact (if it is a fact) that the particular action under examination has already been authorized by Congress. Again, defendants expressly concede the point: "In the ordinary NEPA case, legislation authorizing a given project will not preclude post-authorization judicial review of a project EIS for its adequacy under NEPA...." Brief for Appellees 36 n. 32. That is a fundamental premise of NEPA, and the essential logical predicate of a vast volume of NEPA cases, including most prominently those cases reviewing under NEPA decisions by the Army Corps of Engineers to go forward with public-works projects that Congress had specifically authorized by statute, and for which it had appropriated funds. A leading example in this Circuit is Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir.1972), a decision that led to an injunction suspending work on the Cache River drainage project in Eastern Arkansas, a project that had been specifically authorized by statute. Congress of course can authorize anything it likes, subject always to constitutional limits, and can repeal NEPA pro tanto anytime it wishes, but a simple authorization statute, not mentioning NEPA, is normally taken to leave NEPA intact. Such a statute is a direction that a given action go forward, but on the assumption that other applicable laws, including NEPA, will be complied with. Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783, 785 (D.C.Cir.1971).[2]
 
 
 122
 So, as matters stood when the question of whether and how to deploy the MX first arose, NEPA was fully applicable. An EIS comparing in detail the environmental effects of alternative basing modes would have been required. Neither defendants nor the Court[3] contest this proposition. Instead, they maintain that Section 110 was a definitive and programmatic decision by Congress in favor of basing in silos. It follows, they argue, that an EIS discussing another basing mode would be useless. I now turn to this argument, which is the keystone of the Court's position.
 
 II.
 A.
 
 123
 Section 110 reads in pertinent part as follows:
 
 
 124
 SEC. 110. (a)(1) Funds appropriated pursuant to the authorization of appropriations in section 103 may be used to procure not more than 21 operational MX missiles for deployment.
 
 
 125
 (2) MX missiles procured with funds authorized to be appropriated by section 103 shall be deployed in existing Minuteman missile silos that are part of the 319th and 400th Strategic Missile Squadrons and supported by Francis E. Warren Air Force Base, Wyoming. The first ten MX missiles procured for deployment by the Air Force shall be placed on alert status, with appropriate security and logistics facilities in operation, not later than December 31, 1986.
 
 
 126
 (b)(1) The Secretary of the Air Force shall prepare a full draft and final environmental impact statement in accordance with all terms, conditions, and requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) on the proposed deployment and peacetime operations of MX missiles in the Minuteman silos referred to in subsection (a). The final environmental impact statement on the proposed deployment of such missiles shall be published not later than January 31, 1984.
 
 
 127
 (2) Notwithstanding any other provision of law, the Secretary of the Air Force (A) may immediately commence planning, facility and equipment designing, surveying, and other predeployment activities with respect to the MX missile, and (B) shall proceed promptly following the publication of the final environmental impact statement referred to in paragraph (1) with deployment of MX missiles in the missile silos referred to in subsection (a).
 
 
 128
 (c) This section shall be carried out in a manner consistent with the provisions of section 1231.
 
 
 129
 Act of September 24, 1983, Pub.L. 98-94, 97 Stat. at 621-22.
 
 
 130
 Section 1231 of the Defense Authorization act for fiscal year 1984 (the 1984 Act), referred to in Section 110(c), reads in pertinent part as follows:
 
 
 131
 (c)(1) Not later than January 15 of each year from 1984 through 1988, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a report--
 
 
 132
 * * *
 
 
 133
 * * *
 
 
 134
 (C) on developments related to silo-hardening technology.
 
 
 135
 97 Stat. at 694.
 
 
 136
 The Court and the Air Force read Section 110(b)(1) as a limitation on the usual meaning of NEPA. The fact that the statute refers to "the proposed deployment ... of MX missiles in the Minuteman silos referred to in subsection (a)" is said to represent a Congressional decision in favor of the silo basing mode for all time and for all 100 missiles then projected, and to exclude the need for an EIS that would examine other basing modes. With all respect, I am unable to square this position either with the language of Section 110 or with basic NEPA concepts. As I have already attempted to explain, NEPA applies with full vigor even to agency actions specifically authorized by Congress. Therefore, even if the reference to "MX missiles in the Minuteman silos referred to in subsection (a)" was intended to cover all missiles then or thereafter authorized, and not just the 21 missiles referred to in Section 110(a)(1), NEPA would still require a detailed exploration of alternative basing modes. An EIS on "proposed deployment ... in ... silos" must consider all reasonable and viable alternatives, one of which must surely be deployment in some other fashion. If deployment in silos is the proposed federal action, deployment somewhere else is an alternative obviously demanding consideration. Alternative basing modes are neither remote nor speculative. They were and are very much within the scope of active debate on the MX program.
 
 
 137
 This conclusion is confirmed by a parsing of Section 110. To begin with, it does not even begin to be a NEPA exemption. On the contrary, the Section specifically refers to NEPA and directs the preparation of "a full draft and final environmental impact statement in accordance with all terms, conditions, and requirements of" the statute. As I have previously noted, Congress can repeal or modify NEPA anytime it wants to, and it clearly knows how to accomplish this result in plain language. When it passed the Jackson Amendment authorizing the Scowcroft Commission's investigation and report, for example, it specifically provided that "the report required under this subsection shall not be subject to the requirements of Section 102(2)(C) of the National Environmental Policy Act of 1969 relating to environmental impact statements." Pub.L. 97-377, paragraph (7)(C), 96 Stat. 1830, 1847-48 (1982). The Amendment was carefully worded: it exempted from NEPA the report to be prepared by the Scowcroft Commission, but pointedly refrained from exempting the missile proposal itself. The intent of the Amendment was simply to prevent the functioning of the Scowcroft Commission itself from being disrupted by NEPA litigation.
 
 
 138
 Far different are the terms of Section 110, adopted after the Scowcroft Commission report was submitted. It is true that Section 110(b)(2) directs that the 21 missiles referred to in subsection (a) be deployed promptly, but this deployment is to occur only "following the publication of the final environmental impact statement referred to in paragraph (1)." Presumably Congress was not interested in a pro forma or perfunctory compliance with NEPA. Simply the proffer of a piece of paper labeled EIS would not have satisfied it. The reference is rather to an EIS that fully complies with NEPA, and whether any given EIS fulfills that qualification is a proper question for resolution by a court if its processes are invoked by parties with standing to sue, as is unquestionably the case here. Section 110(a)(2) does place a December 31, 1986, deadline on the deployment of the first ten missiles, and that provision could possibly be read to override or supersede NEPA in the event of a conflict, but no such deadline on deployment is fixed for the other 11 missiles authorized by Section 110. The phrase "[n]otwithstanding any other provision of law," with which Section 110(b)(2) begins, cannot possibly be read as an override of NEPA, because subparagraph (B) of that same subsection (2) expressly refers to the publication of an EIS. This conclusion is confirmed by the legislative history, which shows that what Congress wanted was not just any study that defendants might call an EIS. The Senate Armed Services Committee stated that "[t]he stipulation in law of a date certain for completing this EIS is not intended in any way to compromise the integrity or quality of this statement." S.Rep. No. 174, 98th Cong., 1st Sess. 115 (1983).
 
 
 139
 Accordingly, it seems clear to me that when Congress enacted Section 110 it intended to do at least two things: (1) authorize the procurement of 21 missiles; and (2) direct the Secretary of the Air Force to deploy those missiles, but only after the publication of an EIS that fully complied with NEPA. Such an EIS must include consideration of all reasonable alternatives, including alternative basing modes. If there is any doubt about the meaning of Section 110, and I must concede that there is some, in view of the opinion being expressed by a majority of this Court, the doubt ought to be resolved in favor of full application of NEPA. That statute itself so requires. Section 102(1) of NEPA provides as follows:
 
 
 140
 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter....
 
 
 141
 42 U.S.C. Sec. 4332(1). This is a Congressionally mandated rule of construction, addressed to all agencies of the Executive Branch and to the courts. It must mean, at least, that legitimate differences of opinion as to the interpretation of statutes should be resolved in favor of the policies expressed in NEPA, one of which is that major federal actions significantly affecting the quality of the human environment should not go forward until their effects have been fully explored in an EIS.
 
 
 142
 Thus, if Section 110 can, so far as language and grammar are concerned, be read in either of two ways, one of which would restrict the application of NEPA, and the other of which would not, NEPA itself directs us to select the second interpretation. So, even if Congress is taken to have directed that ten missiles be deployed by December 31, 1986, at all events, and even if it is also taken to have directed that 21 missiles be procured and deployed after the preparation of a truncated EIS, both of which propositions I cannot accept, there is still no basis for arguing that NEPA should be haltingly or grudgingly applied with respect to any missiles after the first 21. And even if Section 110 were a programmatic decision with respect to the entire MX missile project, including all 100 missiles envisioned by the Scowcroft Commission, another proposition that I cannot accept, it would not follow that an EIS failing to address alternative basing modes is legally sufficient. For, as already explained, express Congressional authorization of agency action is not, absent plain language amounting to repeal of NEPA pro tanto, an exemption from full-scale NEPA review, at least on procedural grounds like the sufficiency of an EIS.
 
 
 143
 If we were dealing with a Congressional decision that, once authorized, could be and was promptly and fully carried out, there might be room for a contrary argument. In such a case, the agency action would be a fait accompli at the time of the filing of a NEPA complaint, and whether the EIS was sufficient, or indeed whether one had been prepared at all, might be only of academic interest. That of course is not the case here. This case deals not with a single, discrete, promptly executed or executable action, but rather with a massive weapons-system program, necessarily requiring years for its complete execution even under the best of conditions. The nature of the beast is that the agency involved, here the Air Force, must of necessity return to Congress periodically for additional authorizations and appropriations. Each time it does so, it is open to Congress to reconsider the entire project, except to the extent that it has already been put into operation. The fact that 21 missiles or 50 missiles have been put into silos does not mean that the rest of the 100 missiles must also be so deployed. It does not even mean that the 21 or 50 missiles in silos could not be taken out and re-deployed in some other way. The Court minimizes the utility of an EIS in such a situation by dismissing it as merely informational (a comment also made with respect to the Section 1231 report on silo-hardening technology). But the whole purpose of an EIS is informational, to supply the decisionmakers, in this case Congress, with comprehensive information on which to base their decision. If the information is less than complete, as it will be if the EIS fails to discuss alternative basing modes, Congress's basis for decision is correspondingly weaker.
 
 B.
 
 144
 So far, my discussion has been limited to the 1984 Act and its genesis in the Jackson Amendment. In reaching its conclusion that the 1984 Act was a comprehensive, programmatic decision intended to exclude for all time the possibility of alternative basing modes, the Court also discusses some of the subsequent statutes affecting the MX project. I now turn to this subsequent statutory history. In my view, it requires a conclusion opposite to that which the Court has reached.
 
 
 145
 In 1985, 21 additional MX missiles were authorized. Act of October 19, 1984, Pub.L. 98-525, Section 110, 98 Stat. 2504 (the Defense Authorization Act for Fiscal Year 1985, commonly referred to as the "1985 Act"). As the Court observes, this Act makes no explicit reference to a basing mode other than placement in silos, but it does require that the President submit to Congress a report containing, among other things, "a discussion of the basing mode for the MX missile (and related improvements in silo-hardening technology)." Section 110(e)(3), 98 Stat. 2506. If Congress in 1984 decided for all time what the basing mode would be, why did it in 1985 direct the President to submit a report discussing the basing mode, including improvements in silo-hardening technology? Presumably the relevance of whether silo-hardening technology has improved or not is that such improvements, or the lack of them, might affect a decision whether to continue to use silos. That Congress had just such a possibility in mind is conclusively demonstrated by Section 110(g)(1)(E) of the 1985 Act, which directs the President to submit, whenever additional missile requests are made, a report on "efforts to develop more survivable basing modes for the MX...." 98 Stat. 2506. Such language must mean that, at least as to any missiles authorized after 1985, Congress had firmly in mind the possibility that the basing mode might need to be changed. If, as the Court observes, ante at 456, these reporting requirements are "merely Congressional requests for information," I cannot see how this fact aids the Court in reaching its conclusion with respect to NEPA. For NEPA itself, as I have said, is concerned with just that: information desirable for Congress or an agency to have in making a decision.
 
 
 146
 The Defense Authorization Act for the next fiscal year, 1986, became law on November 8, 1985. Pub.L. 99-145. The MX missile program is dealt with in Section 141 of this Act. 99 Stat. at 603-04. Section 141(a) authorizes not more than 12 additional missiles, making a total of 54 authorized up to that time. But, under Section 141(b), no more than 50 of the missiles may be deployed at any time in existing Minuteman silos. What, then, was to become of the other four missiles? The answer appears in Section 141(c), providing that further procurement of missiles shall be limited to those missiles necessary for testing, "[u]nless a basing mode for the MX missile other than existing Minuteman silos is specifically authorized by legislation enacted after the date of the enactment of this Act...." 99 Stat. at 604.
 
 
 147
 The Court finds in this Act "some of the strongest evidence that Congress viewed subsequent appropriations for MX missiles as increments to the programmatic goals and requirements outlined in Secton 110 of DAA 1984." Ante at 457. Again I find myself in disagreement. The legislation does not direct that any missiles actually be deployed in silos. It simply places a 50-missile cap on those that are so deployed, and provides that any missiles above that number shall be used for testing. Recall that the programmatic decision that was supposed to have been made in 1984 contemplated 100 missiles' being placed in silos. This is wholly inconsistent with the provision of Section 141(b)(2)(A) of the 1986 Act that no funds may be used to prepare more than 50 Minuteman silos for the deployment of MX missiles. Additionally, Section 141(c) expressly contemplates that Congress may select another basing mode. This seems a clear indication that Congress thought the debate as to basing modes was still continuing. It follows that an EIS comparing the relative environmental impacts of various basing modes would be potentially of great use, and, therefore, that Congress should not lightly be taken to have decided against such an EIS in the absence of clear and explicit language.
 
 
 148
 The Court appears to concede that such a reading of the 1986 Act is "perhaps syntactically correct...." Ante at 458. If this is true, as of course I agree that it is, it follows almost inexorably that this is the reading that ought to be selected by the courts. For, as already noted, NEPA itself, in Section 102(1), directs the courts to interpret other statutes, including the 1986 Act, in such a way as to further, to the fullest extent possible, the policies of NEPA. If such a rule of construction means anything, it means that a statute susceptible of two syntactically correct readings, one of which would exclude an EIS, and the other of which would require it, must be read in the latter fashion.
 
 
 149
 There is a great deal more to the history of Congressional consideration of the MX missiles and their basing mode, and this subsequent history leaves no doubt in my mind that the Court's holding is in error. The 1987 Defense Authorization Act, Pub.L. 99-661, 100 Stat. 3816, became law on November 14, 1986. Section 103 of this Act, 100 Stat. 3826, authorized funds for procurement of missiles, including 12 additional MX missiles (bringing the total to 66), but it made no additional provisions as to deployment, and did not change the 50-missile cap on MX's that could be deployed in silos. Thus, as matters stood after adoption of the Act for fiscal year 1987, 66 missiles had been authorized, but no more than 50 could be placed in silos. Unless the remaining 16 had been irrevocably earmarked by Congress merely for testing, which seems unlikely, this state of affairs must mean that Congress contemplated the real possibility that another basing mode would be selected, at least as to the second 50 of the originally contemplated complement of 100 missiles.
 
 
 150
 The situation became even more clear when the Air Force came to Congress with its request for fiscal years 1988 and 1989. (Apparently the pattern of requesting budget authority only for one fiscal year at a time has now been broken.) As part of this request, the Air Force proposed a new basing mode for the MX, known as the "Rail-Garrison Basing Mode." See Appellees' Petition for Rehearing 11 n. 8. Under this alternative basing mode, the missiles would be transported to different launch locations using the existing rail network. In response to this development, the Senate Armed Services Committee directed that the Air Force prepare "a site-specific environmental impact statement on the peacetime deployment and operation of the Peacekeeper Rail-Garrison system...." S.Rep. No. 100-57, 100th Cong., 1st Sess. 103 (1987). And, contemplating that the rail-garrison mode might thereafter be authorized by Congress, the Committee recommended repeal of the existing prohibition, see Section 1426(a) of the 1986 Act, against acquiring more parts or assembling more warheads than would be required for 50 deployed missiles plus those spare warheads necessary for maintenance and testing. It was the Committee's intention thus to permit the Air Force to prepare for deployment of additional MX missiles in the future if another basing mode should be authorized. S.Rep. No. 100-57, supra, at 192. The key point here is, at least from the point of view of the Senate Armed Services Committee as of May 8, 1987, the date of its report, that no more than 50 missiles were ever going to be deployed in silos. Deployment of remaining missiles appeared to be dependent upon Congressional approval of the rail-garrison basing mode, or perhaps some other basing mode.
 
 
 151
 Later in 1987, the future of the MX missile program became somewhat clearer. The Omnibus Budget Reconciliation Act of 1987, Pub.L. 100-203, 100 Stat. 1330, became law on December 22, 1987. Section 8001 of this Act, 100 Stat. 1330-280, sets the levels of budget authority and budget outlays for fiscal years 1988 and 1989 for national defense. The Conference report on the bill that became this law, H.R.Rep. No. 100-495, 100th Cong., 1st Sess. (1987), contains the following enlightening passage headed "ICBM MODERNIZATION":
 
 
 152
 The conferees agree to provide $1,086,000,000 for the ICBM Modernization program. This includes $36,000,000 for the Peacekeeper program [that is, the MX]; $700,000,000 for the small ICBM program; and $350,000,000 for the Rail-Garrison initial program, in order to maintain the 1991 initial operational capability for the Peacekeeper missile in the Rail-Garrison basing mode.
 
 
 153
 133 Cong.Rec. H 12602 (daily ed. December 21, 1987).
 
 
 154
 Thus, an alternate basing mode, one other than silos, is now more than a mere potential. Congress has indicated its willingness to spend $350,000,000 for this basing mode, and the President's current Budget states:
 
 
 155
 The Budget continues development of a Rail-Garrison basing mode for the Peacekeeper ICBM.
 
 
 156
 Budget of the United States Government, Fiscal Year 1989, page 511, transmitted to Congress on February 18, 1988 as Presidential Message 106, 100th Cong., 2d Sess.
 
 
 157
 Nor is this all. If press reports are to be believed, and I have no reason to doubt them, the defendant Carlucci himself now takes the position that the MX's should be pulled out of silos and deployed on railroad cars. Arkansas Democrat, Saturday, February 6, 1988, page 1B. It seems that Secretary Carlucci has testified to this effect before the Senate Foreign Relations Committee. Additionally, on February 26, 1988, the Air Force apparently filed a notice of intent to prepare an environmental impact statement for the "Peacekeeper Rail-Garrison System." Arkansas Gazette, Sunday, February 28, 1988, page 4B. It further appears that Congress has approved $350,000,000 for rail-garrison-basing-mode research in fiscal year 1988, and that the President's budget request for 1989 for this purpose is $793,000,000. Arkansas Gazette, Friday, February 19, 1988, page 12A.
 
 
 158
 Of course reliance on newspaper reports is not a secure basis for adjudication, but they at least raise serious questions that ought to be answered. I wonder why counsel for the Air Force did not keep the Court fully advised of these developments, which, at the least, seem relevant to defendants' position that Congress in 1984 decided for all time that 100 missiles were to be placed in silos.
 
 
 159
 In light of this history, especially the 1987 and 1988 developments, the single-programmatic-decision rationale urged by the defendants and adopted by the Court seems untenable. It is built on a dubious reading of the 1984 Act, cast into doubt by language in the 1985 and 1986 Acts, and demolished by Congressional developments in 1987 and 1988. The Air Force is arguing that its EIS need not cover alternate basing modes, at the same time that it is publicly announcing an intention to prepare an EIS on just such a basing mode. One is tempted to ask whether this development might make the case moot. The answer may be that the Air Force regards the two EIS's as entirely separate investigations, one having to do with the environmental effects of basing in silos, and the other having to do with the environmental effects of the Rail-Garrison mode. If this is true, the EIS's may contain valuable information, but they will be of little aid in helping the decisionmakers resolve the basing-mode debate that is obviously still raging. A comparison of the environmental impacts of the two basing modes, and perhaps of others as well, is crucial to this debate. Accordingly, I must respectfully dissent from the Court's holding that the EIS presently before it may be completely silent as to alternate basing modes.
 
 III.
 
 160
 To summarize: I agree that the case is justiciable and that Colorado's claims should be decided by the District Court on remand in conformity with this Court's opinion. I cannot agree that Section 110 of the 1984 Act absolves the Air Force of the duty to consider the environmental impacts of alternate basing modes. The language of the Act itself, especially when viewed in the context of NEPA doctrine and policy, fails to support such a conclusion, and subsequent legislative developments make it clear just how vulnerable the theory of a once-and-for-all decision for silos, made in 1984, is. I therefore respectfully dissent in part.
 
 
 
 *
 Pursuant to Fed.R.App.P. 42(c), we substitute the names of the present Governor of Colorado, Secretary of Defense, and Secretary of the Air Force in this caption
 
 
 [1]
 Section 110 of DAA 1984 provides in relevant part:
 The Secretary of the Air Force shall prepare a full draft and final environmental impact statement in accordance with all terms, conditions, and requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) on the proposed deployment and peacetime operations of MX missiles in the Minuteman silos * * *.
 
 
 [2]
 The environmental groups request an injunction requiring the Air Force to prepare a satisfactory EIS and a prohibitory injunction enjoining the continuation of any activities upon the MX missile project until such a document is prepared and considered
 Colorado requests a declaration that the EIS and its preparation were inadequate. Further, it requests an order requiring the Air Force to (1) prepare a Supplemental Environmental Impact Statement (SEIS) that includes an analysis of the missile project's impact on Colorado and (2) implement appropriate measures to mitigate impacts in the state. Finally, Colorado requested an injunction preventing "an irretrievable commitment of resource to the project until an SEIS is prepared."
 
 
 [3]
 By a subsequent order of the Court, dated September 1, 1987, the Air Force was required to submit a statement of the issues it intended to address before the en banc court. They were as follows:
 
 
 [1]
 Are the claims of the environmental groups involving alternative weapons systems and alternative basing modes non-justiciable because of the limitations imposed by section 110 of DAA 1984?
 
 
 [2]
 Are the claims of the environmental groups involving intentional use of the MX missile non-justiciable because of limitations imposed by section 110 of DAA 1984 and the political question doctrine?
 
 
 [3]
 Was the district court correct in concluding that any form of injunctive relief would be barred by the political question doctrine?
 See Appellees' Second Supplemental Submission at 2-3.
 
 
 [4]
 The first paragraph of the Jackson Amendment, 96 Stat. 1830, 1846, provides:
 RESEARCH, DEVELOPMENT, TEST, AND EVALUATION, AIR FORCE
 For expenses necessary for basic and applied scientific research, development, test, and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment, as authorized by law; $10,650,661,000, to remain available for obligation until September 30, 1984: Provided, That none of the funds appropriated in this Act may be obligated or expended to initiate full scale engineering development of a basing mode for the MX missile, until such basing mode is approved by both Houses of Congress in a concurrent resolution * * *.
 (Subsection (1) of the amendment continues:)
 It shall not be in order to introduce any such resolution prior to the receipt by the Congress of the report of the President required under subsection (7).
 
 
 [5]
 Subsection (7) of the Jackson Amendment provides:
 (A) The President shall submit a report to the Committees on Appropriations and Armed Services of the Senate and the House of Representatives, not earlier than March 1, 1983 containing:
 (i) a detailed technical assessment of the closely spaced basing system transmitted by the President to Congress on November 22, 1982 or such modifications thereto as the President determines to be advisable;
 (ii) a detailed technical assessment of other MX basing systems that might serve as alternatives to the closely spaced basing system transmitted by the President to Congress on November 22, 1982;
 (iii) a detailed technical assessment of different types of intercontinental ballistic missiles that might serve as alternatives to the MX missile * * *.
 
 
 [6]
 Subsection (7) of the Jackson Amendment provides that the President shall submit a report containing:
 (iv) a comparative detailed technical assessment of alternative programs including acceleration of the Trident II program to provide target coverage equivalent to that of the MX missile system, enhancements and improvements to the Minuteman missile force, and development and deployment of a land-based missile system in deep underground basing, multiple protective shelters and closely spaced basing incorporating mobility and deception, a road mobile missile smaller than the MX and a common missile for land and sea deployment.
 
 
 [7]
 It is important to note that, although the Jackson Amendment directed the President to assess the environmental impact of each system or missile under consideration, paragraph 7(c) provided that "the report required under this subsection shall not be subject to the requirements of Section 102(2)(C) of the National Environmental Policy Act of 1969 relating to environmental impact statements."
 
 
 [8]
 Paragraph 7(B) of the Jackson Amendment provides:
 The President shall include in the report submitted pursuant to paragraph (A) an assessment of the military capability of each alternative system or missile; an assessment of the survivability of each alternative system or missile; an assessment of the survivability of each such system or missile against current and projected Soviet threats; an assessment of the projected cost that each such system or missile might have on present and future arms control negotiations; an assessment of the geographic, geological, and other qualifications a site for each such system or missile would likely require; an assessment of the environmental impact each such system or missile would likely have; and the identification of possible sites for each such system or missile.
 
 
 [9]
 We reject the notion that this phrase merely describes the project subject to review. We note that the project in question is sufficiently identified in a preceding subsection of the statute. Section 110(a)(2) of DAA 1984 states:
 MX missiles procured with funds authorized to be appropriated by section 103 shall be deployed in existing Minuteman missile silos that are a part of the 319th and 400th Strategic Missile Squadrons and supported by Francis E. Warren Air Force Base, Wyoming.
 
 
 [10]
 Finally, both the environmental groups and the dissent argue that, even in the absence of section 110, the MX missile project is independently subject to NEPA and to that statute's required consideration of alternatives. If this is true, it would then seem logical, as a matter of construction, to read any additional language attached to a reaffirmation of the applicability of NEPA that describes discreet areas of EIS coverage as a limitation, rather than a superfluous description of the project. See supra n. 9
 
 
 [11]
 Section 1231(c) of DAA 1984 provides in relevant part:
 (1) Not later than January 15 of each year from 1984 through 1988, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a report--
 (A) on the progress being made with respect to the development and deployment of the MX missile system * * *
 (C) on developments related to silo-hardening technology.
 
 
 [12]
 Section 110(b) of DAA 1985 provides that none of the money it authorized:
 may be obligated for the procurement of additional operational MX missiles unless--
 (1) After March 1, 1985, the President submits to Congress a report described in subsection (e);
 (2) a joint resolution approving the obligation of those funds is enacted as provided for in this section; and
 (3) a second joint resolution is enacted as provided for in the Department of Defense Authorization Act, 1985 (or in a joint resolution providing funds for the Department of Defense for fiscal year 1985), further approving the obligation of those funds.
 
 
 [13]
 Subsection 110(e) of DAA 1985 provides in relevant part that a report under section 110(b)(1) shall include:
 (1) a statement that the President has determined that further acquisition of operational missiles under the MX missile program is in the national security interest of the United States and is consistent with United States arms control policy;
 (2) finding of the President concerning the effect of acquisition and deployment of such missiles on the vulnerability of the United States land-based intercontinental ballistic missile force;
 (3) a discussion of the basing mode for the MX missile (and related improvements in silo-hardening technology) and of proposals for the basing mode for the small, single-warhead intercontinental ballistic missile * * *.
 
 
 [14]
 Assuming for the sake of argument that section 110(b)(1) of DAA 1985 did completely open up the question of basing modes, then the joint resolutions of Congress required by DAA 1985 (See MX Missile Authorization, Pub.L. No. 99-17, 99 Stat. 41 (1985) and MX Missiles--Obligation of Funds, Pub.L. No. 99-18, 99 Stat. 42 (1985)) would have the effect of creating an explicit congressional action readopting the silo-based program. As such, the congressional action concerning the first forty-two missiles would be immune from the necessity, under NEPA, to consider alternative courses of action. See League of Women Voters, Inc. v. United States, 730 F.2d 579, 584 (10th Cir.1984) (it is well settled that congressional decisions and authorizations are not subject to NEPA); see also Lamm v. Weinberger, slip op. at 15-17
 
 
 [15]
 Section 1231(e) of DAA 1984 was amended to read in relevant part:
 (e) The President shall submit to Congress, coincident with the submission to the Congress of any request made after September 24, 1983 for funds for the procurement of operational MX missiles intended for deployment, a written assessment relating to the requirement for and the anticipated impact of the procurement of such missiles. This assessment shall include the President's judgment with respect to--* * *.
 (D) the progress of efforts to develop more survivable basing modes for the MX and other intercontinental missiles, including a new small mobile intercontinental ballistic missile.
 
 
 [16]
 Section 141(b) of DAA 1986 provides:
 LIMITATION ON DEPLOYMENT AND BASING OF MX MISSILES.--
 (1) The number of MX missiles deployed at any time in existing Minuteman silos may not exceed 50.
 (2) Funds appropriated pursuant to this or any other Act may not be used--
 (A) to modify, or prepare for modification, more than 50 existing Minuteman silos for the deployment of MX missiles;
 (B) to acquire basing sets to modify more than 50 existing Minuteman silos for the deployment of the MX missiles; or
 (C) to procure long-lead items for the deployment of more than 50 MX missiles.
 
 
 [17]
 Section 141(c) of DAA 1986 provides:
 ADDITIONAL LIMITATIONS ON THE DEPLOYMENT AND BASING OF MX MISSILES.--Unless a basing mode for the MX missile other than the existing Minuteman silos is specifically authorized by legislation enacted after the date of the enactment of this Act, after procurement of 50 MX missiles for deployment in existing Minuteman silos--
 (1) further procurement of MX missiles shall be limited to those missiles necessary to support the operational test program and for the MX missile reliability testing program.
 (2) during fiscal year 1987, depending upon the most efficient production rate, from 12 to 21 missiles should be procured for such purposes.
 
 
 [18]
 Responding to the clear programmatic decision of the Congress embodied in section 110 of DAA 1984, the Air Force has proceeded, without hesitation, to deploy the MX missiles in the Minuteman silos. According to the deployment schedule released by the Air Force, 38 missiles should be in place at the time this opinion is released. All 50 missiles are to be deployed by December 19, 1988. See Letter from Peter R. Steenland, Jr., Chief, Appellate Section, Land & Resources Division, Department of Justice, to Robert St. Vrain, Clerk, United States Court of Appeals for the Eighth Circuit, March 9, 1988, Attachment "A"
 
 
 [19]
 In its 1987 report, the Armed Services Committee noted serious concerns in terms of the Rail-Garrison basing mode, particularly concerning the fact that the survivability of the Rail-Garrison system depends on a dispersal of rail cars that takes several hours to accomplish. This, together with the 30 minutes of strategic warning generally viewed necessary to respond to a nuclear attack, presented a very problematic "lag time" in terms of the United States' ability to respond to nuclear attack. In light of this significant problem, the committee held hearings "into the adequacy of, and DOD's confidence in receiving, strategic warning indicators on a timely basis." In response, the Committee was "not entirely persuaded" by the information received from the Air Force and declared its intent the following year to "explore further the case for deployment of an ICBM system that is dependent for its survivability on hours of strategic warning." See S.Rep. No. 100-57, 100th Cong., 1st Sess. 103 (1987)
 The report continued:
 As to the particular choice of Rail-Garrison MX, the committee found the Air Force unable to answer many fundamental questions about Rail-Garrison operations after strategic warning has been declared. How the MX trains would be integrated into the existing rail network--which may itself be undergoing the severe stress of a full-scale conventional forces mobilization--and how the security of their location can be preserved with a non-secure railroad communications and signal environment are typical of the kinds of questions for which the Air Force lacks good answers.
 * * *
 Accordingly, while urging the Air Force to continue to preserve the option for an early 1990's deployment, including the conduct of siting studies and a site-specific environmental impact statement on the peacetime deployment and operation of the Peacekeeper Rail-Garrison system, the committee directs the necessary conceptual work be completed and reported to the Congress before spending substantial sums on the Rail-Garrison approach.
 Id.
 
 
 [20]
 Moreover, we fail to understand how the recommendation of the Armed Services Committee last year that the limits in section 141 of DAA 1986 on "piece parts" and assembly of additional MX missiles (other than for testing) be rescinded undermines the programmatic effect of section 110 of DAA 1984. In making this recommendation, the Committee specifically noted that nothing in its action implied approval of any basing mode nor lifted any limits imposed on fabrication or deployment of missiles embodied in DAA 1986. According to the Committee, its action was undertaken merely to preserve the possible "option" to meet a 1991 goal of deploying 100 missiles in some manner. See S.Rep. No. 100-57 at 192
 
 
 [21]
 Because we find that section 110 of DAA 1984 represents a programmatic decision governing the EIS requirements for all the MX missiles authorized for deployment by Congress, we need not reach the question of whether the MX silo-based project is independently subject to NEPA
 
 
 [22]
 Should Congress authorize additional missiles pursuant to the recommendations of the President and the Scowcroft Commission (i.e. replacing Minuteman III missiles in existing silos), we leave to it the question of determining the level of environmental compliance required by NEPA. Should the Congress not explicitly address this issue, we can only assume that compliance will be governed by section 110 of DAA 1984
 
 
 [23]
 16 U.S.C. Sec. 1801 (1982 Ed. & Supp. II 1984)
 
 
 [24]
 See discussion supra section II.B. of this opinion
 
 
 [1]
 Accord, Jackson County, Missouri v. Jones, 571 F.2d 1004 (8th Cir.1978) (deciding on its merits a NEPA challenge to the decision of the Air Force to move its Communications Service from Kansas City to St. Louis). We said: "The Department of Defense is not excepted from the requirements of the Act...." Id. at 1007
 
 
 [2]
 In EDF v. Froehlke this Court noted that it was not dealing with a post-NEPA authorization. 473 F.2d at 355. (Appropriations for the Cache River project, however, had been voted after the enactment of NEPA.) Here, the authorizing statute was enacted after NEPA. Defendants do not suggest that this circumstance in itself absolves them from the EIS requirement
 This case involves only the procedural aspect of NEPA, the requirement of a detailed and adequate EIS. Plaintiffs do not urge us on this appeal to review the substantive decision to deploy the MX. It was once the law of this Circuit that such substantive decisions are reviewable, under an arbitrary-and-capricious standard, for compliance with the policies stated in NEPA. EDF v. Froehlke, supra, 473 F.2d at 352-55. It is not necessary to explore in this case whether this is still a viable doctrine. See Vermont Yankee Nuclear Power Corp., 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).
 
 
 [3]
 The Court expresses no view on "the question of whether the MX Project is ... subject to NEPA" independently of Section 110. Ante at 460 n. 21