**STATE OF MISSOURI, ex rel., Jeremiah W. ("Jay") NIXON, et al., Plaintiffs,**

v.

**Colonel Richard W. CRAIG, et al., Defendants.**

**No. 96–4086–CV–C–9.**

United States District Court, W.D. Missouri, Central Division.

Aug. 29, 1997.

---

1. Apparently presuming that an automatic stay is in effect, plaintiff has not responded to defen- dant's bill of costs or motion for attorneys' fees.

904

William J. Bryan, IV, Mo. Atty. Gen.'s Office, Jefferson City, MO, Joseph Bindbeutel, Mo. Atty. Gen.'s Office, Jefferson. City, MO, Jeremiah Jay ˙Nixon, Atty. Gen., Mo. Atty. Gen's Office, Jefferson City, MO, for State of Missouri, Mel Carnahan.

Robert Joseph Vincze, Law Offices of Robert J. Vincze, Overland Park, KS, for Mo–Ark Association.

Alleen S. VanBebber, U.S. Atty.'s Office, Kansas City, MO, Fred R. Disheroon, U.S. Dept. of Justice Environment and Natural Resources Div., Washington, DC, for Richard W. Craig, H. Martin Lancaster, Togo P. West.

Julie Krenz, Bismarck, ND, for State of N.D., amicus.

Tim D. Hall, Helena, MT, for State of Mont., amicus.

John P. Guhin, Pierre, SD, State of S.D., amicus.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BARTLETT, Chief Judge.

On September 23, 1996, plaintiffs State of Missouri and the MO–ARK Association (MO–ARK) filed their First Amended Complaint (Complaint) pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* Plaintiffs allege that the Army Corps of Engineers (the Corps) adopted an Annual Operating Plan for 1996–97 in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* Specifically, plaintiffs allege that the Corps took a "major Federal action" regarding management of the Missouri River without first preparing an Environmental Assessment, Finding of No Significant Impact, or Environmental Impact Statement.

This case is before the court on the parties' cross-motions for summary judgment. Also before the court are the suggestions of amici curiae States of Montana, North Dakota, and South Dakota.

### I.

### BACKGROUND

Pursuant to the Flood Control Act of 1944, 58 Stat. 887, the Corps is responsible for managing the six dams and reservoirs that constitute the Missouri River Main Stem Reservoir System (Main Stem). The Corps' management of the Main Stem is intended to improve flood control, irrigation, power generation, navigation, fish and wildlife conservation, recreation, water quality, and water supply. See Plaintiffs' Suggestions in Support, Ex. 1 (Draft Environmental Impact Statement); Defendants' Suggestions in Support, Ex. 1–C, p. 1 (Reservoir Regulation Manual).

In 1979, the Corps prepared a Reservoir Regulation Manual (Master Manual) for the Main Stem. The Master Manual states as follows:

In order to achieve the multi-purpose benefits for which the main stem reservoirs were authorized and constructed, they must be operated as a hydraulically and electrically integrated system. Therefore, this master manual presents the basic objectives and the plans for their optimum fulfillment, with supporting data.

Master Manual, p. I–1.

One of the Corps' purposes in operating the Main Stem is to regulate commercial navigation on the Missouri River. The eight-month commercial navigation season on the Missouri River lasts from approximately April 1 through approximately December 1, depending, in part, on ice conditions in the river. *Id.* at IX–6. Commercial navigation during ice-free seasons is "dependent upon low flow supplementation from the main stem reservoir system, with occasional assistance from certain tributary reservoirs." *Id.*

The Master Manual provides that the navigation season may be shortened in the event of a severe drought "in order to conserve the remaining available water supply." *Id.* at IX–9. The 1979 Master Manual provides "[c]urrent criteria" for shortening the navigation season in the event of drought. *Id.* Whether the navigation season will be shortened in a particular year depends on the level of water storage in the reservoir system on July 1 of that year. (The level of water storage in the system is measured in million acre-feet (maf). An acre-foot is the amount of water needed to cover one acre of land with one foot of water. *See* 1996–97 AOP, p. vii.) The Master Manual provides that a navigation season may be shortened by two weeks if the system storage falls below 39 maf on July 1 of the year in question. Master Manual, Table 9. This figure is sometimes referred to as the trigger point.

The Corps shortened the Missouri River navigation season due to drought conditions in 1981, 1988, 1989, 1990, 1991, and 1992. Defendants' Suggestions in Support, Ex. 1, pp. 4–5 (affidavit of Duane Sveum).

The Master Manual, which establishes the "basic objectives" of the river management,

also provides for the preparation of an Annual Operating Plan (AOP) by the Corps. Master Manual, p. IX–20. An AOP is adopted by the Corps to provide the following:

> a. A basis for advance coordination with the Federal, state, and local agencies which are concerned with operation of the main stem reservoirs;
>
> b. A guideline to actual operations;
>
> c. A record of past operations and accomplishments; and
>
> d. A means of informing interested agencies and individuals concerning past and expected future operations.

*Id.* at IX–20.

Pursuant to the Corps' 1996–97 AOP, if the reservoir storage level falls below 52 maf by July 1, 1997, then the Corps may shorten the navigation season by two weeks. In the briefing it is unclear at times whether plaintiffs are claiming that the Corps failed to comply with NEPA in adopting the entire AOP or whether plaintiffs are claiming only that the Corps failed to comply with NEPA in raising the trigger point. Based on the wording of the Complaint and the focus of plaintiffs' argument, plaintiffs are making the latter argument, i.e., defendants failed to comply with NEPA in raising the trigger point to 52 maf in the 1996–97 AOP. *See* Complaint, ¶¶ 34, 47.

Before the 1996–97 AOP was adopted, the Corps held six public meetings for review, discussion, and commentary on the contents of the proposed AOP. *See* 1996–97 AOP, pp. 1–2. The Corps also accepted written comments from interested parties on the proposed plan. *Id.* The final version of the 1996–97 AOP was adopted and published during the briefing of the parties' cross-motions and replaces the 1995–96 AOP. Because the 1996–97 AOP replaces the 1995–96 AOP and because the 1996–97 AOP raises the trigger point as did the 1995–96 AOP, plaintiffs' motion will be denied as moot to the extent that it seeks review of the obsolete 1995–96 AOP.

The Master Manual provides for a five year extension to the AOP "to serve as a guide for longer range planning of the operations of the main stem . . . ." Master Manual, p. IX–22. The 1996–97 AOP includes a proposed five year extension of the 52 maf trigger point. 1996–97 AOP, pp. 123–25. Although the Corps has proposed to extend the higher trigger point for five years, the Corps has only adopted the 52 maf trigger point for the 1996–97 season. Whether the same trigger point will be in effect after the 1996–97 season depends on whether the Corps adopts an AOP incorporating the 52 maf figure in the future.

Plaintiffs allege that the change in the trigger point from 39 maf to 52 maf in the 1996–97 AOP is a "major Federal action" that will cause economic and environmental harm not considered by the Corps. *Id.* at ¶¶ 9–17, 34, 41–42, 47–49. Therefore, plaintiffs allege that the Corps was obligated but did not prepare an Environmental Impact Statement(EIS), Environmental Assessment (EA), or Finding of No Significant Impact (FONSI) as required by NEPA. *See* Complaint ¶¶ 34–40.

Plaintiffs also allege that the Corps' action was taken in violation of "the Corps' own rules governing system operations." Complaint, ¶ 1. Plaintiffs pray "for an order mandating that the defendants operate the reservoirs as specified in the Master Manual unless and until the appropriate Environmental Assessments and Environmental Impact Statements have been prepared . . . ." Complaint, *ad damnum* clause at ¶ 3.

This is the second time plaintiffs have challenged the Corps' attempt to provide for shortening the navigation season. On May 11, 1992, these and other plaintiffs filed a Complaint alleging that the Corps violated its own rules as set forth in the Master Manual by adopting a plan that made it possible to shorten the 1992 navigation season to conserve water in case of drought. *See Missouri v. Bornhoft*, No. 92–4206–CV–C–9. Plaintiffs' request for a preliminary injunction was denied on the ground that plaintiffs did not show irreparable harm or likelihood of success on the merits. *See* transcript of proceedings, August 28, 1992, p. 9. The case was dismissed as moot at the close of the 1992 navigation season. *See* Order Dismissing Case as Moot dated June 21, 1993.

The Corps moves for summary judgment in this case on the grounds that 1) plaintiffs lack standing, 2) the challenged Corps action is committed to agency discretion and therefore not subject to judicial review, 3) the challenged Corps action relates to routine operational and managerial actions which are not governed by NEPA, and 4) the challenged Corps action is categorically excluded from NEPA. Defendants' Motion for Summary Judgment, p. 2.

Plaintiffs move for summary judgment on the ground that the Corps failed, as a matter of law, to satisfy the requirements of NEPA. Plaintiffs' Suggestions in Support, p. 1.

## II.

### STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, (1970); *Inland Oil and Transport Co. v. United States,* 600 F.2d 725, 727–28 (8th Cir.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420, (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning,* 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.,* 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* at 249–51, 106 S.Ct. at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Anderson v. Liberty Lobby,* 477 U.S. at 249–51, 106 S.Ct. at 2511. Essentially, the question in ruling on a motion for summary

judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–53, 106 S.Ct. at 2512.

## III.

## DISCUSSION

It is undisputed that the Corps did not prepare an EIS, EA, or FONSI before changing the trigger point to 52 maf in the 1996–97 AOP. *See* Uncontroverted Material Facts (plaintiffs' motion) 17–19. Therefore it is necessary to decide 1) whether plaintiffs have standing to bring this case and 2) whether NEPA's requirements apply to the challenged agency action.

### A. *Plaintiffs' Standing*

Article III of the United States Constitution limits the power of the federal judiciary to the resolution of "Cases" or "Controversies". *Boyle v. Anderson,* 68 F.3d 1093, 1099 (8th Cir.1995). A "Case" or "Controversy" exists only if one or more of the plaintiffs in an action have standing to sue.

The United States Supreme Court has stated that a plaintiff must satisfy the following elements as an "irreducible constitutional minimum" in order to have standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical' "[.] Second there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). *See also Mausolf v. Babbitt,* 85 F.3d 1295, 1301 (8th Cir.1996).

Constitutional standing must be present even if a party's claim seeks judicial review of agency action under the APA. *See Valley Forge Christian College v. Americans United for Sep. of Church and State, Inc.,* 454 U.S. 464, 487 n. 24, 102 S.Ct. 752, 766–67 n. 24, 70 L.Ed.2d 700 (1982) ("Neither the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III."); *Florida Audubon Soc. v. Bentsen,* 94 F.3d 658, 665 (D.C.Cir.1996).

The burden of proof is on the plaintiff to establish the elements of standing. *Id.* at 561–63, 112 S.Ct. at 2137.

Here, plaintiffs argue that they have "procedural standing" (Supplemental Suggestions of MO–ARK in opposition, p. 5) or have suffered a "procedural injury" (Suggestions of State of Missouri in opposition, p. 9) as a result of the Corps' alleged failure to comply with NEPA.

"The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressibility and immediacy." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142–43 n. 7; *Idaho Pub. Util. v. I.C.C.,* 35 F.3d 585, 591 (D.C.Cir.1994) (right to require agency to prepare an EIS or EA is a procedural right invoking relaxed redressibility and immediacy requirements under *Lujan*). A plaintiff asserting violation of a procedural right must nevertheless satisfy the constitutional requirement of a "concrete harm". *Lujan,* 504 U.S. at 573 n. 8, 112 S.Ct. at 2143 n. 8.

Therefore, it is necessary to determine whether plaintiffs have suffered a concrete harm sufficient to satisfy the constitutional requirements for standing.

### 1. *Standing of MO–ARK*

MO–ARK is a voluntary, nonprofit association whose organizational purposes are to promote flood control, navigation, irrigation, recreation, fish and wildlife, the environment, conservation, and the beneficial use of land and water resources within the Missouri River Basin. MO–ARK's Suggestions in Opposition, Ex. 5 (affidavit of Don Hurlbut, Sr.).

Some of MO–ARK's members are the Missouri Levee and Drainage District Association, Inc.; the City of Kansas City, Missouri; John Madgett; Donald Huffman; Michael Waters, Jr.; Roger Blaske; and Thomas Schrempp.

■ A membership organization has standing to assert the claims of its members if 1) some of its members would otherwise have standing to sue in their own right; 2) the interests it seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members. *International Union v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986).

The Corps does not dispute MO–ARK's assertion that the interests involved in this case are germane to MO–ARK's purpose. The Corps also does not dispute MO–ARK's assertion that participation of its members in this case is not required. Therefore, the only issue is whether any of MO–ARK's members would have standing in their own right to prosecute this matter (i.e., whether any member has suffered a concrete harm).

■ To satisfy the concrete harm requirement, an individual must have suffered the invasion of a legally protected interest that is concrete and personal to the plaintiff. *Lujan,* 504 U.S. at 559–61, 112 S.Ct. at 2136. The injury must also be "distinct and palpable". *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *United States v. SCRAP,* 412 U.S. 669, 687–88, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973)(plaintiff must show "that he has been or will in fact be perceptibly harmed by the agency action"). The injury requirement may be satisfied by environmental or aesthetic injuries. *SCRAP,* 412 U.S. at 684–87, 93 S.Ct. at 2415; *Dubois v. United States,* 102 F.3d 1273, 1281 (1st Cir.1996).

■ To have standing, the plaintiff's injury need not be "significant;" a "small" stake in the outcome will suffice if it is direct. *SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14. However, a plaintiff may not rely on a potential future injury or one that is hypothetical or fantastic. *Sierra Club v.*

*Robertson,* 28 F.3d 753, 758 (8th Cir.1994) (plaintiffs must show that future injury is "certain to ensue"); *Mausolf,* 85 F.3d at 1301.

■ Furthermore, because plaintiffs allege that defendants failed to comply with NEPA, plaintiffs' injuries must fall within the zone of interests protected by NEPA. *See Idaho Pub. Util.,* 35 F.3d at 590; *Florida Audubon Soc.,* 94 F.3d at 665; *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir.1976). NEPA was not designed to prevent economic harm "but was intended to promote governmental awareness of an action concerning environmental problems." *Churchill Truck Lines, Inc.,* 533 F.2d at 416. *See also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (NEPA construed to encompass claims for injury to the recreational use, aesthetics, or well-being of the human environment). Therefore, a plaintiff who asserts that an agency failed to comply with NEPA must show some environmental injury in order to have standing. *Id.* However, the fact that a plaintiff may have suffered economic injury is not fatal to standing to challenge an agency's failure to comply with NEPA because "[i]ndividuals motivated in part by protection of their own pecuniary interest can challenge administrative action under NEPA provided that their environmental concerns are not so insignificant that they ought to be disregarded altogether." *Robinson v. Knebel,* 550 F.2d 422, 425 (8th Cir.1977).

MO–ARK submitted facts purporting to demonstrate that the 52 maf trigger point in the 1996–97 AOP has caused and will cause economic and environmental harm to MO–ARK's members. Specifically, MO–ARK submitted affidavits from Donald Huffman and John Madgett demonstrating that the mere possibility of a shortened navigation season under the 1996–97 AOP has caused actual injury to the environment and to them.

Donald Huffman, who is Vice–President of MO–ARK and Executive Vice–President of Phoenix Towing Company, a Missouri corporation with offices in Clayton, Missouri, stated in his affidavit, in part, as follows:

3. Uncertainty caused by the U.S. Army Corps of Engineers' action to set criteria to shorten navigation seasons not in accordance with table 9 in the Master Manual will further reduce the tonnage shipped by barge.

4. The change from 39 m.a.f. in system storage to 52 m.a.f. to determine the length of the navigation season ... will disrupt shipping schedules and reduce the tonnage shipped by barge.

5. This tonnage will shift to other modes of transportation with a resultant increase in air pollution and safety hazards.

MO–ARK's Suggestions, Ex. 10 (affidavit of Donald Huffman).

John Madgett, who is a board member of MO–ARK and Senior Vice–President of Mid–West Terminal Warehouse Company, a Missouri corporation with offices in Kansas City, Missouri, stated in his affidavit that the change in trigger point "has and will disrupt shipping schedules and reduce the tonnage handled on the River...." *Id.* at Ex. 9 (affidavit of John Madgett). Madgett concludes that "[t]his tonnage will shift to other modes of transportation with a resultant increase in air pollution." *Id.*

MO–ARK also submitted a report prepared by the United States Department of Transportation, Maritime Administration, entitled "Environmental Advantages of Inland Barge Transportation." *Id.* at Ex. 11. This report supports the assertions of Huffman and Madgett that the environment is harmed when means of transportation other than barge or vessel are used for commerce. The report discusses studies that compared different means of transportation. *Id.* at 23. The studies conclude that "vessels have fewer accidents, consume less energy, produce fewer harmful emissions, and are less disruptive to society in general." *Id.* The report also states that "[a]ir pollution resulting from water transport is far less than truck and is comparable to, or less than, rail, depending on such variables as terrain, route, etc." *Id.* at 17.

■■■ Huffman and Magdet live and work in proximity to areas that will be adversely affected by pollution resulting from de-creased commercial navigation. Therefore, MO–ARK has submitted facts sufficient to show that at least some of its members have suffered and will suffer concrete environmental harm as a result of the possibility that the navigation season will be shortened. That the harm may be relatively small does not preclude MO–ARK's members from satisfying the concrete harm requirement. *See SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14. Having presented facts to show that its members have suffered a concrete injury within the zone of interests protected by NEPA, MO–ARK has organizational standing to prosecute this case.

Because MO–ARK has presented facts showing injury even if the navigation season is not shortened, this case will not be moot if system storage exceeds 52 maf on July 1, 1997.

### 2. *Standing of State of Missouri*

Under *Ashwander v. TVA,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936), federal courts should avoid passing on constitutional issues which are not necessary to the resolution of a case. In accordance with this principle, the United States Supreme Court has held that if one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case. *See Idaho Pub. Util. v. I.C.C.,* 35 F.3d 585, 591 (D.C.Cir.1994); *Railway Labor Exec. Ass'n v. United States,* 987 F.2d 806, 810 (D.C.Cir.1993).

Except for the presentation of different facts purporting to demonstrate injury in fact, each plaintiff's position in this case is substantially similar. In fact, plaintiffs' Motion for Summary Judgment was filed jointly. Furthermore, plaintiffs seek only declaratory and injunctive relief against defendants. Therefore, I am persuaded that it is unnecessary to decide whether the State of Missouri has standing.

### B. *Agency Discretion*

Defendants move for summary judgment on the ground that the challenged agency action is committed to agency discretion and is therefore not subject to judicial review.

The APA entitles an individual who has been adversely affected by agency action to judicial review of that action. 5 U.S.C. § 702. Under this section of the APA, there is a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate. *Natural Resources Def. Council, Inc. v. SEC,* 606 F.2d 1031 (D.C.Cir.1979). Pursuant to the APA, judicial review is inappropriate in two situations.

First, there can be no judicial review when statutes preclude judicial review. 5 U.S.C. § 701(a)(1). No review is allowed "in those situations where Congress expresses an intent to prohibit judicial review." *Taylor Bay Protect. Assoc. v. E.P.A.,* 884 F.2d 1073, 1080 (8th Cir.1989) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). This exception to judicial review is not involved in this case.

Second, there can be no judicial review when agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(2). The Supreme Court has held that no review is allowed under this section "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.*

Defendants argue that § 701(a)(2) prevents judicial review in this case because "the Flood Control Act of 1944 grants the Corps broad discretion ... and provides no meaningful standards for judicial review of the challenged Corps action." Defendants' Suggestions in Support, p. 14. However, plaintiffs do not seek review of the merits or substance of the Corps' decision to change the trigger point. *See,* Complaint. Instead, plaintiffs ask this court to "remand the decision to the Corps for further development of the record and compliance with NEPA." MO–ARK's Reply, p. 6. *See also* Plaintiffs' Suggestions in Support, p. 31 ("plaintiffs are seeking a declaration that the defendants must cause the Corps to comply with NEPA before approving any annual operating plan that might reduce the navigation season length").

The issue in this case is the same as the issue in *Goos v. I.C.C.,* 911 F.2d 1283, 1292 (8th Cir.1990), where the Eighth Circuit Court of Appeals stated that "we deal with the threshold issue of NEPA applicability in the first instance." An agency has the responsibility of making the threshold determination as to the applicability of NEPA and its decision will be disturbed only if unreasonable. *Id.*

In *Minnesota Pub. Int. Research Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir.1974), the court stated as follows:

An agency decision concerning NEPA requirements is not one committed to the agency's discretion by law within the meaning of the APA, 5 U.S.C. § 701 et seq. The Congressional command that agencies cooperate in attaining the goals of NEPA "to the fullest extent possible" requires the courts to look at the good faith efforts of the agency to comply. To upset an agency determination not to prepare an impact statement, it still must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could significantly affect the quality of the human environment. [citation omitted]. We therefore hold that review of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Butz,* 498 F.2d at 1320 (footnotes omitted).

Therefore, it is necessary to determine whether the Corps' decision that NEPA does not apply to the decision to raise the trigger point to 52 maf was reasonable under the circumstances.

Plaintiffs incorrectly assert that the Corps was required to prepare a "statement of reasons" demonstrating that it took a "hard look" at the environmental consequences of the proposed action before deciding not to prepare an EIS. Plaintiffs' Suggestions in Support, p. 18. Plaintiffs rely on *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988). However, *Block* involved the issue of whether an agency correctly decided not to prepare an EIS after it had already prepared an EA. *Id.* That is a different issue

from the issue of whether the Corps should have complied with NEPA. *See, e.g., Goos,* 911 F.2d at 1291–92. Therefore, the absence of a "statement of reasons" is not fatal to the Corps' position.

### C. *NEPA*

Defendants argue that NEPA does not apply to this case because 1) setting the trigger point constitutes a routine operation or management activity and therefore is not a "major Federal action" and 2) this agency action is categorically excluded from the requirements of NEPA.

■ NEPA was designed to protect the human environment by ensuring that federal agencies "carefully consider detailed information concerning environmental impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351, (1989); *Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 837 n. 2 (8th Cir.1995) ("the purpose of NEPA is to ensure that government agencies act on full information and that interested groups have access to that information."). NEPA does not mandate particular results, it only prescribes a process to ensure that agencies consider environmental consequences. *Goos v. I.C.C.* 911 F.2d 1283, 1293. NEPA became effective on January 1, 1970.

■ NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C). If there is no agency action meeting this description then NEPA is inapplicable. *Id.* As stated earlier in this opinion, an agency's threshold determination of NEPA's applicability is reviewed for reasonableness. *Goos,* 911 F.2d at 1292.

The preparation of an EIS is costly and time-consuming. *See Cronin v. United States Dept. of Agric.,* 919 F.2d 439, 443 (7th Cir.1990) (the EIS "has been the kiss of death to many a federal project"). Therefore, if a federal agency is unsure whether a proposed federal action will significantly affect the environment, the regulations of the federal Council on Environmental Quality permit the agency to prepare an EA. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.27;

*Knowles v. U.S. Coast Guard,* 924 F.Supp. 593, 602 (S.D.N.Y.1996). If the EA demonstrates that the proposed action will not have a significant impact on the environment, the agency must prepare a FONSI explaining why an EIS is not required by statute. 40 C.F.R. § 1508.9. However, if the EA demonstrates that the proposed action will have a significant impact on the environment, the agency must prepare an EIS.

Agencies are required to identify categories of actions which do not typically have a significant effect on the human environment. 40 C.F.R. § 1507.3 These actions, known as "categorical exclusions", may be performed by agencies without the preparation of an EA or EIS. 40 C.F.R. §§ 1501.4(a)(2), 1508.4. The Corps' categorical exclusions are listed in 33 C.F.R. § 230.9.

#### 1. *Major Federal Action*

Here, there is no dispute that the Corps' decision to set the trigger point at 52 maf is federal in nature. However, defendants argue that the decision is not a major action significantly affecting the quality of the human environment.

No "litmus test" exists to determine what constitutes a major federal action. *Save Barton Creek Assoc. v. Federal Hwy. Admin.,* 950 F.2d 1129, 1134 (5th Cir.1992). Federal regulations state that "[e]nvironmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations [ ]. Agencies shall prepare statements on broad actions...." 40 C.F.R. § 1502.4(b). An action may also be major if it produces major effects. 40 C.F.R. § 1508.18.

■ Activities that constitute major federal action significantly affecting the quality of the human environment under NEPA include the following: the construction of an aqueduct, dam, and water collection system, *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir.1974); the construction of a multi-story housing project in connection with a Postal Service vehicle maintenance facility in New York City the size of a city block, *Chelsea Neighborhood Assoc. v. United States Postal*

*Serv.,* 516 F.2d 378 (2d Cir.1975); the construction of a highway through wetlands and through a state park, *Maryland Conserv. Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir.1986); the construction of a water intake structure, pier, boathouse, and concrete pipe to supply water to city and surrounding counties, *Roanoke River Basin Assoc. v. Hudson,* 940 F.2d 58 (4th Cir.1991); the deployment and peacetime operation of MX missiles, *Romer v. Carlucci,* 847 F.2d 445 (8th Cir.1988); the construction of interstate highway over 10–15 years at a cost of $1 billion, *Neighborhood Transp. Net., Inc. v. Pena,* 42 F.3d 1169 (8th Cir.1994); the construction of a domed football stadium in place of retail, commercial, and industrial facilities, *Missouri Coalition for the Envir. v. Marsh,* 866 F.2d 1025 (8th Cir.1989).

■ Activities that do not constitute major federal action significantly affecting the quality of the human environment include the following: a plan to conduct a 90 day test that would temporarily increase aircraft noise in residential areas, *City of Alexandria v. Helms,* 728 F.2d 643 (4th Cir.1984); the reduction of water flow from a dam in order to conserve water for irrigation during a drought, *Upper Snake River v. Hodel,* 921 F.2d 232 (9th Cir.1990); the decision to discontinue using herbicides to control vegetation in national forest, *Minnesota Pesticide Info. & Educ., Inc. v. Espy,* 29 F.3d 442 (8th Cir.1994).

■ Implementation of a new program or construction of a new facility is not a prerequisite to the existence of a major federal action significantly affecting the quality of the human environment. Rather, "if an agency program were to be expanded or revised in a manner that constituted a major federal action significantly affecting the quality of human environment, an EIS would [be] required to accompany the underlying programmatic decision." *Andrus v. Sierra Club,* 442 U.S. 347, 362–63, 99 S.Ct. 2335, 2343, 60 L.Ed.2d 943 (1979); *Upper Snake River,* 921 F.2d at 234 ("if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS."). Therefore, in this case it is necessary to determine whether the Corps concluded reasonably that its change in the trigger point from 39 maf to 52 maf in the 1996–97 AOP did not constitute a major federal action significantly affecting the quality of the human environment.

The facts of this case are more analogous to the facts of *Upper Snake River* than to the cases finding major Federal action. In *Upper Snake River,* the defendant Bureau of Reclamation (the Bureau) managed and operated the Minidoka Irrigation Project in the State of Idaho. *Upper Snake River,* 921 F.2d at 233. During normal weather conditions, the Bureau maintained the water flow at or above 1,000 cubic feet per second (cfs). *Id.* However, during periods of drought, the Bureau departed from its standard operating procedure and decreased the flow to 750 cfs. *Id.* at 233–34. It was undisputed that the Bureau's action of decreasing the flow would have a "negative impact" on the downstream environment. *Id.* at 234. Plaintiffs brought suit seeking to compel the Bureau to prepare an EIS before reducing the water flow. *Id.*

The district court concluded that the Bureau's action was not a major Federal action under NEPA and dismissed the case. *Upper Snake River v. Hodel,* 706 F.Supp. 737, 742 (D.Idaho 1989). The Court of Appeals affirmed, stating as follows:

[A] particular flow rate will vary over time as changing weather conditions dictate. In particular, low flows are the routine during drought years. What does not change is the Bureau's monitoring and control of the flow rate to ensure that the most practicable conservation of water is achieved in the Minidoka Irrigation Project. Such activity by the Bureau is routine.

*Upper Snake River,* 921 F.2d at 235–36.

■ Here, the Corps is seeking to adjust Main Stem water releases and storage in 1997, as it has done in the past, in furtherance of its many responsibilities under the Flood Control Act of 1944. Although the action "may" affect wildlife downstream and has caused a decrease in inland barge shipping, plaintiffs have not presented facts showing that a potential two week reduction in the navigation season this year is a major

action that has caused or will cause a major environmental impact. Plaintiffs have not presented facts specifying the degree to which the threat of a shortened navigation season will increase pollution, endanger wildlife, or otherwise harm the environment. Plaintiffs have also not presented facts demonstrating any major environmental impact even if the 52 maf trigger point is extended for five years as proposed by the 1996–97 AOP. Therefore, plaintiffs have not shown any "major Federal action significantly affecting the quality of the human environment" and the Corps' conclusion that NEPA is inapplicable to the decision to increase the trigger point in the 1996–97 AOP is not unreasonable.

In 1989 the Corps decided to review its Water Control Plan and update the Master Manual, last published in 1979. *See,* Plaintiffs' Suggestions in Support, Ex. 1 (Draft Environmental Impact Statement). The project, which included 24 public hearings, was "a comprehensive technical and environmental review of the Master Manual" that cost over $13 million to complete. *See* Plaintiffs' Suggestions in Support, p. 15; *id.* at Ex. 16 (letter from Corps to Governor Carnahan, dated June 5, 1995). In an attempt to comply with NEPA, the Corps prepared a Draft Environmental Impact Statement (DEIS) in relation to its comprehensive review of the Master Manual. Plaintiffs' Suggestions in Support, Ex. 1, p. 1–3; Complaint, ¶ 36. Plaintiffs represent that the Corps' DEIS contains thousands of pages and 22 separately bound appendices. Plaintiffs' Suggestions in Support, p. 15.

On June 5, 1995, the Corps recommended that further study be conducted and a revised DEIS be prepared. *Id.* at Ex. 16. The Corps expects the revised DEIS to be completed in 1998 and the final EIS to be completed in 1999. *See* Defendants' Suggestions in Opposition, attachment 2 (declaration of Colonel Richard Craig).

The DEIS prepared by the Corps discussed 383 possible changes to the Master Manual. Some of these changes included shortening the navigation season on the Missouri River by a period of two months. *See* Plaintiffs' Suggestions in Support, Ex. 5, p.

1–2 (Alternatives Evaluation Report). The Corps' DEIS discusses in detail the environmental effects of shortening the navigation season by a period of two months. For example, the Corps states that "[s]hortening the navigation season slightly increases the average annual system storage ( ) and lake water surface elevations [ ]." *Id.* at p. 3–6.

Based on the Corps' findings in the DEIS, plaintiffs argue that the potential for shortening the navigation season by two weeks is a major federal action significantly affecting the quality of the human environment. However, plaintiffs' argument is unpersuasive because the proposal studied in the DEIS decreased the navigation season by two months, approximately four times the possible reduction in the navigation season challenged here. In an eight-month season, the difference between a possible two week reduction and a two-month reduction is significant. Therefore, the Corps' findings regarding the effects of a two-month reduction do not support plaintiffs' claim that the possibility of a two-week reduction this year is a major federal action significantly affecting the quality of the human environment. On the contrary, the Corps' findings regarding the effects of a two-month reduction support the reasonableness of its conclusion that a two-week reduction is not a major federal action significantly affecting the quality of the human environment. Under these circumstances, preparation of neither an EA or a FONSI or an EIS was required.

Revising and updating the entire 1979 Master Manual may well constitute a major federal action. However, changing the trigger point from 39 to 52 maf is not the type of "broad" agency action referenced in 40 C.F.R. § 1502.4(b).

In addition, plaintiffs argue that the potential shortening of the navigation season is a "change[ ] in pool level operations" requiring an EA pursuant to 33 C.F.R. § 230.7. Plaintiffs' Suggestions in Support, p. 24. Defendants state in response that "all of the Corps' actions have the effect of raising and lowering elevations in the Corps' reservoirs regardless of the purpose of the action." Defendants' Suggestions in Opposition, p. 10.

Even though an argument could be made that under some circumstances the setting of a new trigger point could affect the amount of water being impounded, plaintiffs have not shown that the Corps was unreasonable in concluding that the setting of a new trigger point does not affect pool level operations as the term is used in 33 C.F.R. § 230.7.

Finally, plaintiffs argue that "[t]he real reason for deviating from the Master Manual is improper." Plaintiffs' Suggestions in Support, p. 27. Specifically, plaintiffs allege that the Corps was motivated to change the trigger point by "upstream state pressure" and by political concerns surrounding the confirmation hearing for the new Assistant Secretary of the Army for Civil Works. *Id.*

This case involves the Corps' alleged failure to comply with NEPA and the resulting procedural injury to plaintiffs. Plaintiffs' final argument relates to the Corps' motivation for its action, which is not directly at issue. Therefore, plaintiffs' final argument will be considered only to the extent that it pertains to the reasonableness of the Corps' decision that NEPA is inapplicable.

Even when judicial review of agency action is limited, a court "may entertain charges ... that the agency's decision was occasioned by impermissible influences, such as fraud or bribery...." *Story v. Marsh*, 732 F.2d 1375, 1381 (8th Cir.1984). However, the influences identified by plaintiffs fall far short of fraud or bribery. Recognizing that fraud and bribery are only examples of impermissible influences, I am not persuaded that the influences asserted render the Corps' decision unreasonable. For instance, the Corps would be obligated to consider "upstream state pressure" along with other pressures in making decisions effecting the entire system.

Because the Corps' decision regarding the applicability of NEPA was not unreasonable, defendants' motion for summary judgment will be granted and plaintiffs' motion for summary judgment will be denied.

### 2. Categorical Exclusion

Having determined that the Corps' conclusion regarding the applicability of NEPA was not unreasonable, it is unnecessary to determine whether the adoption of the AOP was an action categorically excluded from NEPA.

## IV.

## CONCLUSION

Accordingly, it is ORDERED that:

1) defendants' Motion for Summary Judgment is granted; and

2) plaintiffs' Motion for Summary Judgment is denied.